SOUTHERN LUMBER & COAL CO., A NEBRASKA CORPORATION, APPELLANT, V. M. P. OLSON REAL ESTATE AND CONSTRUCTION CO., INC., A NEBRASKA CORPORATION, AND MARVIN P. OLSON, APPELLEES.

426 N.W.2d 504

Filed July 22, 1988.   No. 86-1017.

James E. Riha for appellant.

C. Jan Headley, of Headley & Sullivan Law Offices, for appellees.

HASTINGS, C.J., CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ., and JOHN MURPHY, D.J.

CAPORALE, J.

Plaintiff-appellant, Southern Lumber & Coal Co., a Nebraska corporation, alleges that the corporate defendant-appellee, M. P. Olson Real Estate and Construction Co., Inc., also a Nebraska corporation, is a sham, as the consequence of which its corporate existence should be disregarded as to the individual defendant-appellee, Marvin P. Olson, and both he and the corporate defendant should be held liable for certain debts the latter incurred. The trial court entered judgment in the sum of $8,726.42, plus prejudgment interest of $3,766.87 together with a $1,000 attorney fee, in favor of plaintiff against the corporate defendant, but dismissed the petition as to the individual defendant Olson. In this appeal, plaintiff asserts the trial court erred in dismissing its action against Olson. The corporate defendant has not appealed. We affirm.

Olson was involved in the home construction business in Omaha from approximately 1972 through 1983 and formed the corporate defendant in February of 1974 for the purpose of building and selling houses on land developed by others.

Olson initially capitalized the corporate defendant, which so far as the record reveals still existed at the time of trial, with $1,000 in cash, a note for $7,500, and the donation of equipment, furniture, and fixtures; he subsequently contributed two building lots and additional cash totaling approximately $12,000 in value, for which he took back the corporate defendant's note, which was carried on the corporation's books as a "note payable." Both the corporate defendant's accountant and the plaintiff's tax expert testified that such an arrangement is common in the housing construction industry. The corporate defendant subsequently built homes on the two building lots contributed by Olson; the corporate defendant's 1982 tax return states that its debt to Olson totaled $14,628.16 by the end of that year.

Minutes of the corporate defendant's directors' meetings indicate that Olson served as president and treasurer of the corporation throughout its life. The first person serving as vice president and secretary resigned on May 15, 1974. The individual succeeding to those positions resigned in 1982, at

which time Olson was elected secretary. Apparently, no one was thereafter elected as corporate vice president, and Olson has served as the corporate defendant's sole director since 1983. Annual stockholder's meetings were held every January from 1975 through 1986, inclusive. The record indicates that in 1984, 1985, and 1986, the corporate defendant held joint stockholder's and director's meetings; Olson was the only person attending in either capacity.

Throughout the existence of the corporate defendant, Olson was its sole shareholder and its only employee. There was no arrangement for Olson to draw wages from the corporate defendant; instead, Olson received an annual bonus determined in consultation with the corporate defendant's accountant and dependent upon the corporation's profits. According to the corporate defendant's accountant, he at some point erroneously treated a personal investment Olson made in Kopecky Development, Inc., as an asset of the corporate defendant. Olson discovered this mistake as he and the accountant were closing the books of the corporate defendant. Although the corporate defendant's 1983 tax return indicates that the $14,628.16 loan from the shareholder, Olson, was repaid by the end of 1983 and that Olson also received a $15,803.31 management fee from the corporation that year, both Olson and the corporate defendant's accountant testified that these were paper transactions necessary to close the corporate defendant's books and cease corporate activity and that Olson in fact received no cash from the corporate defendant in either transaction. Olson declared the $15,803.31 management fee as "other income" on his 1983 individual income tax return, paid income tax on this amount, and did not take a bad debt deduction.

In general, the corporate defendant purchased building lots in development tracts from Southern Land & Development Co., a closely held corporation whose principals were Milton and Betty Faulk, paying $200 down with the seller carrying the balance. The corporate defendant would then purchase construction materials on credit from plaintiff (another closely held corporation whose principals were Milton, Betty, Charles, and Robert Faulk), use those materials to build a house on the

lots it had acquired, and pay off sums due the two Southern companies upon the sale of the house and lot on which it was built. The corporate defendant would sometimes negotiate construction loans from commercial lenders and secure them by giving those lenders first mortgages; in such cases plaintiff would take back second mortgages on the properties. Olson had personally established and participated in this business arrangement with the Southern companies prior to formation of the corporate defendant. Following formation of the corporate defendant, the relationship which had existed between the Southern companies and Olson continued between the Southern companies and the corporate defendant. Over the years, Olson, and later the corporate defendant, participated in such an arrangement with the Southern companies on as many as 100 occasions. Prior to formation of the corporate defendant, plaintiff had drafted purchase agreements which named Olson in his individual capacity as buyer; after formation of the corporate defendant, the corporation was named as buyer in similar documents. The bookkeeper and office manager for both Southern companies testified he was aware that Olson had a corporation; however, he also stated that he was "never really, I guess, made aware, fully aware, that he was doing business as a corporation" with plaintiff.

Olson testified that from the time the corporate defendant was formed, he kept his personal accounts separate from those of the corporate defendant. However, plaintiff's bookkeeper testified that he had issued checks, reflecting amounts reimbursed to a purchaser for timely payment of bills, to Olson in his individual capacity, following payment for supplies used by the corporate defendant to construct houses. The record tells us only, however, that these checks were negotiated by Olson at the bank where the corporate defendant kept its corporate accounts.

During the corporate defendant's first year, only 3 to 5 houses were built; later, as retained earnings grew, the corporate defendant built approximately 20 houses per year. These structures ranged, over the years, from models which sold for about $20,000 to models which sold for more than $55,000. By staggering the start and completion dates of houses

under construction at any given time, the corporate defendant was able to limit its risk in terms of mortgage exposures.

The corporate defendant suffered no losses from 1974 through 1980, accruing retained earnings through this period which stood at $50,570.90 at the end of the 1980 tax year. However, in 1981 the corporate defendant started suffering reversals; by the end of 1982, retained earnings had dropped to $26,700, and the decision was made to cease operations. In its 1983 tax return the corporate defendant declared a loss of $27,629.98. Olson testified that the initial capitalization cash of $1,000, plus the remaining retained surplus, was sufficient to cover this loss at that time.

The corporate defendant was able to negotiate reduced terms and pay off other suppliers, leaving only the sum owed plaintiff unpaid when the corporate defendant ceased operations in 1983.

The unpaid bills which are the subject of this suit derive from the last three houses the corporate defendant built. Olson testified that the amount owed was in dispute because some of the lumber plaintiff supplied was of poor quality and had to be returned. According to the corporate defendant's framing subcontractor, the poor lumber quality resulted in delays, extra work, and occasional reconstruction. The record also reveals plaintiff had a method of giving credit for materials returned to it.

Plaintiff's expert testified that after 1982, the corporate defendant's debt to equity ratio was roughly 14 to 1 and that, as a result, the corporation would have been characterized as a "thinly capitalized corporation" for federal income tax purposes. However, on cross-examination this witness testified that with $50,082.60 of retained earnings in 1979 as against roughly $16,000 in debt, the corporation was not "thinly capitalized" at that time; the corporate defendant continued to be profitable, increasing retained earnings slightly in 1980. Plaintiff's expert also noted that losses were suffered in 1981 and 1982; in 1981, Olson took a $4,000 cut in his take from the corporation, and in 1982, he took no pay from the corporation. In addition, during 1981 and 1982, Olson contributed between $13,000 and $14,000 in loans to the corporation. This witness

also observed that it is common practice for small corporations to carry a note payable to a principal shareholder and to retain earnings, investing sums thus derived for growth. Plaintiff's expert admitted that this appears to have been Olson's strategy in his dealings with the corporate defendant and that the corporation did in fact grow steadily until 1981.

Plaintiff's expert based his opinions entirely upon examination of Olson's and the corporate defendant's tax returns; he did not examine the corporate defendant's books. He testified that tax returns are more reliable indicators of a corporation's financial health than are its books, because the returns "are signed under penalties of perjury," whereas the books of a closely held corporation can be adjusted to "make them reflect almost anything [one wants] them to show." The corporate defendant's 1981 tax return shows that the corporation passed the balance sheet test of solvency at the end of that year, having then $44,994.54 in total assets against $1,519 in current liabilities. Nor was the corporate defendant insolvent at the end of 1982, having total assets at that time of $44,399.57 and current liabilities of $16,650.03. In the expert opinion of the corporate defendant's accountant, the corporation was never insolvent, not even when it ceased activity in 1983, even if the error regarding Olson's personal investment in Kopecky Development, Inc., were removed from its balance sheet as of the end of 1982. Nevertheless, the plaintiff's expert testified that had the Kopecky Development, Inc., investment been treated differently, the tax returns would have shown the corporation to be insolvent as of the end of 1982; in this expert's opinion Olson "mixed corporate and individual tax attributes to benefit himself."

In contrast, the corporate defendant's accountant testified that the corporate defendant .

> was obviously properly capitalized when he incorporated because he operated for years on that capital and very successfully. And then I don't know when; but I do know in the early '80s, there was a great deal of problems in the economy. I mean, interest rates went to 22 percent and so forth. And of course, home builders and a lot of other small businesses had problems at that time.

Now, I can't recall exactly; but someplace, you know, eight years or seven years, six years, after he incorporated, why, the company evidently then started losing money. And at that time, I don't think the corporation owed him any money. But he put — he did loan the company some money. And I don't call that a capitalization. In fact, oftentimes, when a small business is given to that problem, you know, they can't borrow any money. And so if they feel optimistic about their business, that they can turn it around, they will sometimes dig in their own pockets and loan the corporation money. And it appears to me that's what he did.

While the corporate defendant's 1983 tax return reports the corporation had no assets as of the end of that calendar year, its books seem to reflect it had personal property worth approximately $10,000, which included a dump truck, a 1977 pickup truck, a 1976 Lincoln automobile, and certain items of office furniture and equipment. By the time of trial the vehicles had been sold, but the record does not tell us when they were sold or what their value was at that time. Olson retained some of the items of office furniture and equipment in his possession. The corporate defendant's accountant testified that the corporate returns indicated the corporation received nothing from these sales and that by the time the corporate defendant ceased operations, the vehicles and office furniture had been fully depreciated and were, from his perspective, of "immaterial" value, and their disposition was without tax consequences.

In essence, this court is asked to rule that the trial court erred in refusing to allow plaintiff to pierce the corporation's "veil" and reach Olson's individual assets in satisfaction of the debt owed plaintiff by the corporate defendant. Proceedings seeking disregard of the corporate entity, that is, seeking to pierce the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, are equitable actions. *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986). Appeal of such a matter to the Supreme Court is tried de novo on the record, and the Supreme Court is required to reach findings independent of the trial court, subject to the

rule that where credible evidence is in conflict on a material issue of fact, the Supreme Court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Kula v. Prososki*, 228 Neb. 692, 424 N.W.2d 117 (1988); *J. L. Brock Bldrs., Inc. v. Dahlbeck, supra*; Neb. Rev. Stat. § 25-1925 (Reissue 1985).

In *Dahlbeck, supra* at 494, 391 N.W.2d at 113 (quoting *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980)), this court affirmed the rule that " '[i]n equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice.' " As noted in *Dahlbeck, supra* at 494, 391 N.W.2d at 113 (quoting *Workman v. Workman*, 174 Neb. 471, 118 N.W.2d 764 (1962)),

> " 'A court of equity will not permit mere corporate forms to serve as a cloak and a shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties, or to circumvent fraud.' "

Nevertheless, " ' "[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears . . . ." ' " *Dahlbeck, supra* at 497, 391 N.W.2d at 114 (quoting *Scribner Grain & Lumber Co. v. Wortman*, 204 Neb. 92, 281 N.W.2d 394 (1979)).

Among the factors which are relevant in determining to disregard the corporate entity on the basis of fraud are (1) grossly inadequate capitalization; (2) insolvency of the debtor corporation at the time the debt is incurred; (3) diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. These are not acts of fraud in themselves but, rather, are elements of circumstantial proof of fraud.

> " '[T]hey are facts having a tendency to show the existence

of fraud, although their value as evidence is relative not absolute. They are not usually conclusive proof; they are open to explanation. . . . When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent . . . .' "

*Dahlbeck, supra* at 498-99, 391 N.W.2d at 115 (quoting *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 380 N.W.2d 625 (1986)).

We have held that a creditor seeking to pierce the corporate veil and impose on a shareholder liability for a corporation's debt has the burden to show by a preponderance of the evidence that the corporate entity must be disregarded to prevent fraud or injustice to the creditor. *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986).

The foregoing recitation of the facts adduced in the trial court demonstrates that plaintiff failed to adduce sufficient evidence to show that the corporate defendant was insolvent at the time the debt to plaintiff was incurred or that the corporate defendant was a mere facade for the personal dealings of the shareholder who carried on the operations of the corporate defendant in disregard of the corporate entity. While in this latter regard plaintiff places heavy reliance on the treatment of the Kopecky investment, it is not the place of this court to review the wisdom of the tax advice given Olson; suffice it to say that the treatment given the matter falls short of convincing us that Olson disregarded the nature of the corporate defendant.

Of necessity, plaintiff attaches great significance in this court to the corporate defendant's capitalization. This court has observed that "inadequate capitalization" means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails. *Dahlbeck, supra*. Inadequate capitalization is measured at the time of formation; a corporation which was adequately capitalized when formed but which has suffered losses is not necessarily undercapitalized. Undercapitalization presents a question of fact that turns on the nature of the business of the particular corporation.

In *Dahlbeck, supra,* the corporation, the purpose of which was real estate development, held 65 building lots totaling approximately $430,000 in land value. This court held that $3,000 was grossly inadequate capital for a corporation faced with the task of developing so much land. In *Brown v. Alron, Inc.,* 223 Neb. 1, 388 N.W.2d 67 (1986), the entity was incorporated in 1975 but was not capitalized at all until 1981, at which time it was capitalized with a mere $100. Alron was asserted by its shareholder to be a stock holding corporation charged with the task of acquiring an office equipment and supply business for a negotiated price of $77,699. This court had no difficulty determining that under those circumstances Alron's capitalization was grossly inadequate. See, also, *Nebraska Engineering Co. v. Gerstner,* 212 Neb. 440, 323 N.W.2d 84 (1982); *United States Nat. Bank of Omaha v. Rupe,* 207 Neb. 131, 296 N.W.2d 474 (1980).

In this case the corporate defendant was capitalized with $1,000 in cash, a note against Olson for $7,500, and the donation of equipment, furniture, and fixtures of unstated additional value. Both plaintiff's and the corporate defendant's experts are in agreement that Olson's initial capitalization of the corporate defendant was consistent with the usual course of business in the housing construction industry at the time. On these facts we are unwilling to say that the corporation was "grossly inadequately capitalized" when formed in 1974.

This leaves for consideration whether Olson improperly diverted corporate funds or assets to his own uses, as plaintiff claims. As part of its argument in this connection, plaintiff calls our attention to Neb. Rev. Stat. § 21-2046 (Reissue 1983), which in relevant part provides:

> In addition to any other liabilities, a director shall be liable in the following circumstances unless he or she complies with the standard provided in sections 21-2001 to 21-20,134, for the performance of the duties of directors:
>
> . . . .
>
> (3) A director who votes or assents to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all known

debts, obligations, and liabilities of the corporation shall be liable, jointly and severally with all other directors so voting or assenting, to the corporation for the value of such assets which are distributed, to the extent that such debts, obligations, and liabilities of the corporation are not thereafter paid and discharged.

Not having pled a cause of action under the statute, plaintiff appears not to urge that the foregoing statutory language applies directly to the situation at hand or provides an independent statutory basis for piercing the corporate veil, matters we therefore do not address, but, rather, that the statutory language sheds light on the manner in which the treatment of the items of personal property should be viewed.

Not only is the evidence less than certain that the items of personal property had any substantial value even in 1983 when the corporation ceased operations, the record does not tell us the value of the vehicles when they were sold. So far as the record shows, nothing was done with the items of office furniture; the fact they remained in Olson's possession does not necessarily mean they were not still owned by the corporation at the time of trial. Once again, we are unwilling to say on this set of facts that significant corporate assets were diverted to Olson's own uses such as to necessitate imposing personal liability on Olson for debts contracted by the corporate defendant.

AFFIRMED.