## LINDA MARIE MEDLOCK, APPELLANT, V. MELVIN EUGENE MEDLOCK, APPELLEE.

642 N.W.2d 113

Filed April 12, 2002. No. S-00-1083.

Gregory Garland, of Garland Law, P.C., and Kathy Pate Knickrehm for appellant.

Amy S. Geren, of Nolan, Olson, Hansen, Fieber, Lautenbaugh & Geren, and, on brief, Brent M. Kuhn, of Harris, Feldman Law Offices, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

This is an appeal from the decree dissolving the marriage of Linda Marie Medlock and Melvin "Buddy" Eugene Medlock. The issue presented in this appeal is whether Linda was entitled to a share of the assets of Union Oaks, Inc., a nonprofit religious corporation operated by Buddy.

## FACTUAL BACKGROUND

Buddy and Linda were married in 1972 and have five children, three of whom were under the age of 19 at the time of trial. Child custody is not at issue in this appeal.

Buddy was ordained as a minister in 1971 by the Christian Brotherhood, an organization of which Buddy was one of the founders. Union Oaks was founded in 1978; the parties dispute whether Union Oaks was founded by Buddy and Linda, or solely by Buddy. Union Oaks is a tax-exempt organization under the Internal Revenue Code. See I.R.C. § 501(c)(3) (2000). Buddy is the president of Union Oaks.

The seed funding for Union Oaks was provided by the proceeds of real estate sold by Buddy and Linda. Essentially, Buddy and Linda sold their property and transferred their marital property and income to Union Oaks. Buddy and Linda have not owned any personal property since 1978. Instead, Union Oaks has provided Buddy with a parsonage, the use of various vehicles, and a salary that appears to vary from year to year. Joint tax returns,

filed between 1991 and 1998, show total annual income for the Medlocks ranging from $25,181 in 1998 to $7,779 in 1993.

Union Oaks, at the time of trial, owned assets, primarily in real estate, that the district court found to have a total value of approximately $1.3 million. George Tesar, Jr., a certified real estate appraiser retained by Linda to value the property owned by Union Oaks, valued the parsonage at $275,000, an unimproved lot adjacent to the parsonage at $43,000, and a former restaurant used as a banquet hall at $525,000. Union Oaks also owned a $12,000 motorcycle and three other vehicles and had sold six other vehicles since Linda had filed her petition for legal separation. At the time of trial, Union Oaks had cash assets of $134,381.73 and held debts owed to Union Oaks in the amount of roughly $90,000. The only debt admittedly owed by Union Oaks to anyone else was a note owed from Union Oaks to Buddy and Linda in the amount of approximately $50,000. There was conflicting evidence presented regarding the continued existence of certificates of deposit valued at approximately $207,000.

The assets of Union Oaks were accrued from the initial funding provided by Buddy and Linda through a series of real estate transactions, primarily involving "like-kind" exchanges of real property. The details of many of these transactions are rather murky. Generally speaking, Buddy's answers to cross-examination regarding his financial dealings can be characterized as evasive, as Buddy repeatedly denied knowledge or recollection of even the most basic aspects of Union Oaks' financial transactions. It is undisputed, however, that Union Oaks has received very few donations and that most corporate revenue comes from the gains on the purchase and sale of real estate by Buddy.

The debt owed from Union Oaks to Buddy and Linda was the subject of considerable dispute at trial. Buddy and Linda had acquired and jointly held several parcels of real estate prior to the formation of Union Oaks, which were transferred to Union Oaks between 1978 and 1987 in exchange for promissory notes totaling $177,094.49 at the time of execution. The balance on those notes was, or would have been, $269,811 at the time of trial. Buddy testified, however, that the transfers were meant as gifts to Union Oaks and that the notes were executed because his accountant told

him to do it that way. Buddy testified that all of the notes, except the $50,000 note previously mentioned, were "forgiven" by 1991, when Linda filed a previous petition for legal separation that had been voluntarily dismissed. Buddy was otherwise unclear on the circumstances surrounding the forgiving of the notes.

Linda testified, on the other hand, that during the course of the marriage, Buddy repeatedly told her that Union Oaks owed them the money that would have been due from the notes that were later forgiven. The figure set forth above regarding the present value of the notes is taken from an amortization schedule that Linda testified was shown to her by Buddy when Linda asked about the couple's financial situation. Linda testified that only after the couple's separation was she informed that the notes had been forgiven. In addition, Paul Curry, the former president of NP Dodge Management Company, Inc., and a friend of Buddy and Linda, testified that, in 1995 or 1996, while he was counseling Buddy regarding his separation from Linda, Buddy mentioned a note from Union Oaks to Buddy and Linda in the amount of $250,000.

There is substantial evidence in the record establishing Buddy's habit of using Union Oaks funds to pay for what can reasonably be characterized as personal expenses. Buddy testified that when he used corporate funds to pay for personal expenses, he later had those expenses charged against the balance on the remaining note that Union Oaks owed to Buddy and Linda. Charge card statements contained in the record show corporate funds to have been expended on restaurants, groceries, and travel, among other things. Buddy testified that the family's trips to Mazatlan, Mexico, were spent studying and writing, but Linda characterized them as family vacations. Buddy did specifically defend the use of corporate funds, and the Union Oaks tax-exempt identification number, to pay for visits to tanning salons. William Stevens, a certified public accountant employed by Buddy and Union Oaks, testified that Buddy claimed personal expenses paid for by Union Oaks as personal income for tax purposes, but that Stevens did not review the expenses and relied on Buddy to determine which expenses were personal in nature.

The record also contains a substantial amount of testimony regarding the board of directors of Union Oaks and the amount

of actual control that the three members of the board, in addition to Buddy, have exercised over Union Oaks. According to the Union Oaks corporate charter contained in the record, a majority of the board could remove Buddy from office and take control of the assets of Union Oaks.

Three members of Union Oaks' board of directors, in addition to Buddy, testified at trial. The first director, a member of the board since 1994 or 1995, testified that any meetings of the board were called by Buddy. Buddy testified that the board met once a year. This director testified that he never signed checks for Union Oaks, met with lawyers, or discussed any of Union Oaks' real estate transactions. In addition, this director testified that he did not review Union Oaks' books and did not recall ever disapproving any expense or proposal suggested by Buddy. This director also testified that he had not been aware that Buddy had charged personal items to the organization.

Similarly, another witness, a Union Oaks director since 1994, testified that he had not been aware of Union Oaks' ownership of a motorcycle or cars and that he had not been involved in Union Oaks' real estate transactions. This director did not know the cash balance of Union Oaks or about any notes payable to Buddy and Linda. The director did testify, however, that he did not consider himself a puppet of Buddy. A third board member also testified that he did not consider himself to be a puppet of Buddy. He testified, however, that he was not involved in Union Oaks' real estate transactions, except for "[d]uring the board meetings," and was not aware of Union Oaks' ownership of cars, holdings of cash, or certificates of deposit. A former member of the board of directors testified that he resigned from the board when he was unable to get Buddy to resolve concerns over Union Oaks' business practices.

There was relatively little evidence presented regarding the religious ministry of Union Oaks. Buddy testified that he did missionary work as part of his trips to, among other destinations, Mexico, Costa Rica, Panama, Nicaragua, and Taiwan. Buddy also claimed to have conducted weddings and funerals, taught Bible studies, and started "several churches." No independent evidence was presented to corroborate Buddy's claims. When one of the members of Union Oaks' board of directors

was asked about Union Oaks' religious activities, the only thing he could identify that Union Oaks had done for the community in the year prior to trial was to donate some money to the ministry of a local pastor. The same director later testified that in the past, Union Oaks had conducted Bible studies, used the former restaurant property for some religious purposes, held fundraisers for charity, and "been out promoting the word of God." No evidence was presented regarding any other religious activities conducted by Union Oaks.

Linda testified, generally, that she had no involvement in any personal or corporate financial transactions and that she just did what Buddy and Stevens told her to do. While she signed documents, she testified that she was not "in that loop" with regard to financial decisions, even when she served on the board. Linda testified that Buddy informed her only of financial decisions that he made himself and that Buddy expected her to be obedient.

Stevens testified that the Internal Revenue Service (IRS) had audited Buddy and Linda in 1994 for the tax years 1991 and 1992. Stevens testified that the IRS generally concluded that Buddy's status as a "minister of the Gospel" was appropriate under IRS regulations, although adjustments were made to the Medlocks' individual tax returns. While Stevens was employed by Union Oaks, he testified that he only maintained Union Oaks' cashflow and did not prepare balance sheets, payroll reports, or quarterly statements of any kind. No accounting records besides those prepared by Stevens, however, appear in the record.

## PROCEDURAL BACKGROUND

On July 2, 1997, Linda filed a petition for legal separation. Buddy answered and cross-petitioned for dissolution. Trial was had, and on September 18, 2000, the district court entered a decree of dissolution.

The district court made several factual findings that were not memorialized in the decree, but that the district court stated should be present in the record for purposes of appeal. The court noted that Union Oaks had been legally established and was a separate legal entity. The court was "impressed with the fact that the Internal Revenue Service did certify this corporation as a 501C3 corporation." The court stated that

if we had a trial on the status of the corporation, as far as its 501C3 status, we would say that I would be bound by that earlier decision of a court. And while it's not exactly the same situation, I find — I find it very persuasive that the Internal Revenue [Service] came and made an examination of the corporation and that they continued the 501C3 status.

With reference to Buddy, however, the court stated:

I'm not impressed with the defendant's religious activities. I'm not impressed with the fact that the corporation in the last couple of years had approximately ten cars and a motorcycle and trips to various countries. But that's not for me to judge. As a general statement, I do not believe the assertions of the respondent.

The court nonetheless concluded:

On a best — on a best case basis, from the assets he and petitioner gave to the Union Oaks, it is clear that this non-profit corporation has grown in value to approximately $1.3 million. I don't think there's any serious dispute over that particular finding. This Court finds that under the circumstances here that this Court cannot rectify what I consider to be a travesty of this corporation.

Mr. Medlock, if he can reconcile things with his board, will continue to receive automobiles, a parsonage, all of his expenses will be paid, and he will benefit greatly from the assets that he and the petitioner put into this corporation.

It's a situation that this Court feels, and I don't mean to make unkind remarks or to make light of it, but it's kind of like a coin machine where you put your money in and you don't get it back. And this Court does not have Union Oaks before it as a party, and this is not a situation in a classic sense of piercing a corporate veil that we talked about in the law. This is a situation that I can take into account, in my opinion, the benefits that have and continue and will inure to the benefit of Mr. Medlock, but I have not found any case exactly like this one in Nebraska law or otherwise, nor have the attorneys brought to my attention any case that is similar on facts to this case. And in my reading of the law, I cannot take these assets of Union and cut them

in half and say, okay, Mrs. Medlock, the petitioner, you get one-half of the assets of Union Oaks.

Based on those findings, the court went on to order the division of property. The court ordered, in part:

First of all, we start with some of the assets. The note that has been talked about from Union Oaks to the Medlocks in the approximate amount of $50,000, the petitioner receives the entire proceeds of the note. And the order is to provide that Mr. Medlock is to be ordered to make his best efforts to obtain payment of the entire amount by 12/1/2000.

Number two . . . the petitioner is to receive the 1996 Voyager automobile in her possession or an equivalent automobile. And that is to be done forthwith.

In its written decree, the court specified that Buddy was to be required to purchase the automobile from Union Oaks or purchase a comparable vehicle for Linda.

The court then considered the issues of alimony and attorney fees, stating in part:

The next category is alimony. The Court finds that the petitioner in staying at home and raising the children and working in the ministry has seriously disrupted her education and work career; and in addition to the points that I announced earlier as findings, these facts are taken into an [sic] account in the award of alimony, as well as the — as I indicated, the long duration of the marriage.

Commencing October 1, 2000, and continuing for a period of 18 years, respondent shall pay alimony of $1,400 per month to petitioner subject to the standard language regarding termination, and that is death or remarriage under the statutory language. . . .

The attorney fee question in this case presents a very difficult question. The change of attorneys on the petitioner's side, the length of time in preparation, the lost time between the first attorney and the third attorney, the ability to pay of the respondent, creates a very difficult question regarding attorney fees.

The Court has thought a great deal about the question of attorney fees, and under all of the circumstances the Court feels that a reasonable attorney fee in a case of this sort with

as many days of trial as we've had and all the preparation, that an award of $10,000 of an attorney fee to be payable by the respondent to the petitioner within 60 days is an appropriate attorney fee under all of the circumstances.

Linda perfected this appeal, and we subsequently granted Linda's petition to bypass the Nebraska Court of Appeals.

## ASSIGNMENTS OF ERROR

Linda assigns, summarized, that the trial court erred in (1) failing to include property which was held in the name of Union Oaks in the marital estate and (2) its award of attorney fees.

## STANDARD OF REVIEW

The division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001). However, to the extent issues of law are presented, an appellate court has an obligation to reach independent conclusions irrespective of the determinations made by the court below. *Hartman v. Hartman*, 261 Neb. 359, 622 N.W.2d 871 (2001). In an action for dissolution of marriage, the award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001).

## ANALYSIS

The facts of this case are certainly unique. The parties have not cited, nor has our research revealed, a case with established facts that mirror those of the instant case. Nonetheless, there are several well-established legal principles that guide our determinations regarding equitable property division and the equitable piercing of a corporate veil. We begin with those basic principles.

Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 1998) is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is

to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Gibilisco v. Gibilisco, ante* p. 27, 637 N.W.2d 898 (2002). The primary issue presented in this case, whether the assets titled in Union Oaks should be included in the marital estate, arises under the first step of the process.

 Generally, the division of property in a dissolution case is based on equitable principles, and its purpose is to divide the marital assets equitably. *Heald v. Heald,* 259 Neb. 604, 611 N.W.2d 598 (2000). As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Davidson v. Davidson,* 254 Neb. 656, 578 N.W.2d 848 (1998). Linda urges this court to find, pursuant to equitable principles, that Union Oaks is an alter ego of Buddy and that assets titled in Union Oaks should be considered Buddy's property for purposes of dividing the marital estate.

## ALTER EGO

 In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *McCollister v. McCollister,* 219 Neb. 711, 365 N.W.2d 825 (1985). See, also, *Knigge v. Knigge,* 204 Neb. 421, 282 N.W.2d 581 (1979), *modified* 205 Neb. 149, 286 N.W.2d 444 (1980). A corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears. *Southern Lumber & Coal v. M. P. Olson Real Est.,* 229 Neb. 249, 426 N.W.2d 504 (1988). However, " ' "[i]n equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice." ' " *Id.* at 256, 426 N.W.2d at 508. Accord, *Graham Graphics v. Baer Mktg. Internat.,* 10 Neb. App. 382, 631 N.W.2d 550 (2001), quoting *United States Nat. Bank of Omaha v. Rupe,* 207 Neb. 131, 296 N.W.2d 474 (1980); *In re Application of CN Carriers, Inc.,* 1 Neb. App. 1151, 510 N.W.2d 545 (1993), citing *Brown v. Alron, Inc.,* 223 Neb. 1, 388 N.W.2d 67 (1986).

▉▉▉▉ When a corporation is or becomes the mere alter ego, or business conduit, of a person, it may be disregarded. *Carpenter Paper Co. v. Lakin Meat Processors*, 231 Neb. 93, 435 N.W.2d 179 (1989). Among the factors which are relevant in determining to disregard the corporate entity are diversion by the shareholder or shareholders of corporate funds or assets to their own or improper uses and the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. See *id.*

▉▉▉ We have stated that other factors to be considered in determining to disregard the corporate entity are grossly inadequate capitalization and insolvency of the debtor corporation at the time the debt is incurred. These factors are relevant in cases in which creditors are seeking to pierce the corporate veil and hold individual shareholders liable for corporate debts. This case, however, presents the issue of "reverse piercing," in which the assets of the corporate entity may be used to satisfy the obligations of the controlling alter ego. See, e.g., *Towe Antique Ford Foundation v. I.R.S.*, 999 F.2d 1387 (9th Cir. 1993); *Century Hotels v. U.S.*, 952 F.2d 107 (5th Cir. 1992). In such an instance, the relevant factors do not relate to the insolvency of the corporation, but instead to the insolvency of the individual and the extent to which the individual's ostensible poverty is supported by corporate assets.

▉▉▉ Although a question of first impression in this jurisdiction, it is not unusual for a domestic relations court to pierce the corporate veil in a dissolution proceeding. See *Standage v. Standage*, 147 Ariz. 473, 711 P.2d 612 (Ariz. App. 1985). When the equitable principles set forth above have been applied to dissolution of marriage and division of the marital estate, it has generally been concluded that the assets of a spouse's corporate alter ego may be considered to be, and distributed as, part of the marital estate. See, e.g., *A & L, Inc. v. Grantham*, 747 So. 2d 832 (Miss. 1999); *Vallone v. Vallone*, 644 S.W.2d 455 (Tex. 1982); *Barineau v. Barineau*, 662 So. 2d 1008 (Fla. App. 1995); *Watson v. Watson*, 837 P.2d 1 (Utah App. 1992); *Goldberg v. Goldberg*, 172 A.D.2d 316, 568 N.Y.S.2d 394 (1991); *Stainback v. Stainback*, 11 Va. App. 13, 396 S.E.2d 686 (1990); *Standage, supra*; *State ex rel.*

*Grabhorn v. Grabhorn*, 28 Or. App. 357, 559 P.2d 923 (1977), *Lyons v. Lyons*, 340 So. 2d 450 (Ala. Civ. App. 1976).

Applying the above-stated principles to the facts of the instant case, we conclude, on our de novo review, that the record shows Union Oaks to be the alter ego of Buddy and that Union Oaks' assets should be included in the marital estate. As described above, the record demonstrates beyond reasonable question that Buddy made extensive personal use of corporate funds and assets and that Buddy carried on personal dealings in the name of the corporation. The record shows a nearly complete unity of interest between Buddy and Union Oaks. Buddy exercised nearly unfettered control of Union Oaks and regularly purchased vehicles, travel, and other goods and services in the corporate name for his family's personal use. Compare *Watson, supra.*

The record is also clear that the Medlocks did not acquire personal property in their own names because all the property that would ordinarily have been acquired over the course of a 28-year marriage was instead acquired in the name of Union Oaks. Buddy's purported poverty conflicts sharply with the affluent lifestyle he has maintained with the use of corporate assets. Buddy's ability to maintain his family's manner of living, with no reported assets and the meager income to which he will admit, is significant both to our determination that Union Oaks is Buddy's alter ego and to our conclusion that equity requires the assets of Union Oaks to be included in the marital estate.

This court confronted a similar quandary in *Grace v. Grace*, 221 Neb. 695, 380 N.W.2d 280 (1986). In that case, the husband was provided, as an employee and minority shareholder of his family's ranch corporation, with a house, food, vehicles, and other benefits. In awarding the wife a substantial cash payment as part of the property division, we noted:

> Nevertheless, in reaching a just and equitable award, the fact remains that due to the way the parties to this marriage lived during the marriage, they did not acquire a house or a car or any property a married couple of 16 years, with above average assets, would be expected to acquire. We must consider that particular situation in this case.

*Id.* at 701, 380 N.W.2d at 285. See, also, *Dormann v. Dormann*, 8 Neb. App. 1049, 606 N.W.2d 837 (2000). Similar circumstances

are present here. Furthermore, in the instant case, the assets acquired by the parties prior to the formation of Union Oaks were transferred to Union Oaks and form the basis of the corporation's current value. In *Grace, supra,* we ordered a cash award as compensation for the inadequacy of the marital estate. In *Grace,* however, the ranch corporation was clearly a separate legal entity, of which the husband was only a minority shareholder. In this case, on the other hand, Union Oaks has been shown to be Buddy's alter ego, and the distribution of assets from the corporation is a more appropriate remedy.

On our de novo review of the record, we determine that the evidence conclusively shows, insofar as the issues in this divorce case are concerned, that Union Oaks is the alter ego of Buddy, and has been since it was established. The assets which came into Union Oaks during the time of the parties' marriage were in fact part of the marital estate and subject to division upon dissolution. See *Zisblatt v. Zisblatt,* 693 S.W.2d 944 (Tex. App. 1985). The district court erred in concluding otherwise.

Buddy argues, however, that ordinary equitable principles cannot be applied in this case because Union Oaks is a nonprofit corporation, purportedly organized for religious purposes, and because Union Oaks was not a party to the divorce proceedings. We address each of these arguments in turn.

### Nonprofit Status

The fact that Union Oaks is organized as a nonprofit religious corporation distinguishes this situation from an ordinary situation involving a corporate alter ego. Buddy argues that because he did not legally own Union Oaks, it cannot be considered an alter ego. See, generally, Nebraska Nonprofit Corporation Act, Neb. Rev. Stat. § 21-1901 et seq. (Reissue 1997 & Cum. Supp. 2000).

 The essence, however, of the alter ego doctrine is that a court of equity " ' " " 'will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties . . . .' " ' " See *Southern Lumber & Coal v. M. P. Olson Real Est.,* 229 Neb. 249, 256, 426 N.W.2d 504, 509 (1988). Consequently, courts have generally held that legal ownership, while relevant, is not a dispositive factor and does not preclude the finding of alter ego when control of the

corporation is otherwise established. See, *Century Hotels v. U.S.*, 952 F.2d 107 (5th Cir. 1992); *Shades Ridge Holding Co., Inc. v. U.S.*, 888 F.2d 725 (11th Cir. 1989); *Towe v. Martinson*, 195 B.R. 137 (D. Mont. 1996); *Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 420 N.E.2d 251, 50 Ill. Dec. 934 (1981). Because the record clearly establishes such control in this case, as stated above, our finding that Union Oaks is Buddy's alter ego is not affected by the fact that Buddy does not legally own the corporation.

The primary distinction between nonprofit corporations and for-profit corporations is found in the nondistribution constraint, which bars the nonprofit corporation from distributing profits or net earnings to those who control the corporation. See, § 21-19,127 (providing that nonprofit religious corporations "shall not make any distributions"); § 21-1914(10) (defining "distribution" as "the payment of a dividend or any part of the income or profit of a corporation to its members, directors, or officers"). See, also, I.R.C. § 501(c)(3) (defining corporation exempt from taxation as corporation "no part of the net earnings of which inures to the benefit of any private shareholder or individual").

However, the nondistribution constraint does not preclude nonprofit corporations from engaging in commercial activity, as Union Oaks has clearly done. The term "commercial nonprofit" is broadly used by commentators to describe any nonprofit engaged in significant commercial activity, even when the commercial activity is an ancillary endeavor used to subsidize noncommercial activities that are the nonprofit's principal mission. Evelyn Alicia Lewis, *When Entrepreneurs of Commercial Nonprofits Divorce: Is it Anybody's Business? A Perspective on Individual Property Rights in Nonprofits*, 73 N.C. L. Rev. 1761 (1995). In the instant case, for example, Union Oaks, while organized as a nonprofit corporation, engaged in the sale and purchase of real estate in the same manner that might be expected of a for-profit real estate business. The nondistribution constraint does not bar such activity, so long as the income accrued is used in a way that is consistent with the nonprofit purpose of the organization. See, *id.*; § 21-1928 (setting forth general powers of nonprofit corporation). Well-known examples of significant commercial activity used by nonprofit entities to raise money include the merchandising of Sesame Street products and the sale of Girl Scout cookies.

When commercial nonprofits are relatively small, such as Union Oaks, their operational character is analogous to those for-profit organizations commonly referred to "closely held corporations" or "close corporations." See Lewis, *supra*. The reality of blurring between for-profits and nonprofits is continuing to change the legal rules that apply to nonprofits, and as nonprofits have become more business-like in character, many laws once considered inapposite have become relevant. See *id.* Consequently, as stated by Professor Lewis:

> The relevance of divorce law to nonprofits may not be immediately evident. But this reflects one of the problems addressed by this Article: The subtleties of sector-blurring are masked by organizational forms that once accurately reflected organizational substance, but that now have lost their accuracy. The traditional for-purpose/for-profit dichotomy between nonprofits and businesses is no longer sufficiently substantial to justify equating organizational form with substance. Today, many nonprofits serve both for-purpose and for-profit goals . . . . Therefore, many of the legal changes now applicable to nonprofits reflect logical extensions of settled law to the altered reality of nonprofits. Such extensions are based on a fundamental jurisprudential tenet: Similar factual situations dictate similar legal treatment.

*Id.* at 1773. See, also, generally, 18 Am. Jur. 2d *Corporations* § 47 (1985) (stating that status of entity as nonprofit corporation in and of itself does not bar application of equitable remedy of piercing corporate veil).

Accordingly, the courts which have confronted the situation have held that nonprofit corporations are subject to the same rules of law as for-profit corporations with respect to the equitable remedy of "reverse piercing" of the nonprofit corporate veil under an alter ego theory of liability. See, e.g., *Towe Antique Ford Foundation v. I.R.S.*, 999 F.2d 1387 (9th Cir. 1993); *U.S. v. Kitsos*, 770 F. Supp. 1230 (N.D. Ill. 1991), *aff'd* 968 F.2d 1219 (7th Cir. 1992); *Loving Saviour Church v. United States*, 556 F. Supp. 688 (S.D. 1983), *aff'd* 728 F.2d 1085 (8th Cir. 1984); *Barineau v. Barineau*, 662 So. 2d 1008 (Fla. App. 1995). See, also, e.g., *Lakota Girl Scout C., Inc. v. Havey Fund-Rais. Man., Inc.*, 519

F.2d 634 (8th Cir. 1975); *Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 420 N.E.2d 251, 50 Ill. Dec. 934 (1981) (holding individual liable for obligations of alter ego nonprofit corporation).

In *Barineau, supra,* the Florida District Court of Appeal applied reverse piercing, under an alter ego theory, specifically in the context of equitable distribution in a dissolution of marriage. In that case, the trial court entered summary judgment in favor of Faith Chapel, Inc., a nonprofit corporation alleged to be the husband's alter ego. The appellate court reversed the trial court's ruling and remanded the case, stating that basic corporation law is that nonprofit corporations are not exempt from the doctrines of piercing the corporate veil and the alter ego theory. See *id.* The court stated that "[t]he arguments presented by [the husband] do not convince us that the court may never inquire whether a non-profit corporation is the alter ego of a party in a dissolution proceeding for the purpose of achieving equitable distribution." *Id.* at 1009. Instead, the court adopted the wife's theory that "if Faith Chapel is determined to be [the husband]'s alter ego, and if it is determined that the corporation is engaged in improper conduct involving assets that are rightfully marital assets, such findings can be taken into account in equitable distribution." *Id.*

We agree with the foregoing analysis and likewise hold that a corporation's status as a nonprofit corporation in and of itself does not bar a court from finding the corporation to be the alter ego of an individual and from applying the equitable remedy of piercing the corporate veil. Applying that holding to the present case, we determine that application of those equitable principles to Union Oaks is appropriate. Union Oaks, while organized as a religious nonprofit, has nonetheless been financed by its activities as a commercial nonprofit, specifically by real estate transactions. The record is clear that Union Oaks has received few if any donations and that Buddy's real estate transactions have been the primary foundation for Union Oaks' assets. If Union Oaks had been financed by donations from third parties, intended to support religious activities, the equities of this situation would be far different. Under the circumstances presented, however, Union Oaks may be appropriately subjected to the same rules of law that would be applied to a for-profit corporation.

FIRST AMENDMENT

 Buddy argues that Union Oaks is exempt from scrutiny under the First Amendment to the U.S. Constitution, because Union Oaks is a religious organization. The religious activities of Union Oaks, or lack thereof, were the subject of considerable dispute in the district court. However, we need not address the legitimacy of Union Oaks' religious status, as the neutral principles of law set forth above are in any event applicable to Union Oaks. Religious corporations are governed by the same general rules of law and equity as other corporations; in other words, they are subject to the same principles of law as any other civil corporation in courts of general jurisdiction. See, generally, 1A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 80 (perm. ed., rev. vol. 1993 & Cum. Supp. 2001).

 Buddy does not specify whether his First Amendment claim is made pursuant to the Establishment Clause or the Free Exercise Clause. Neither clause, however, supports Buddy's claim that the First Amendment bars the equitable remedy applied above. In Establishment Clause cases, a three-part test has been elaborated by the Supreme Court. Government action passes muster under this clause if (1) the statute or government action has a secular legislative purpose, (2) its principal or primary effect must neither advance nor inhibit religion, and (3) it does not foster excessive government entanglement with religion. *Donovan v. Tony and Susan Alamo Foundation*, 722 F.2d 397 (8th Cir. 1983), *aff'd sub nom. Tony & Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 105 S. Ct. 1953, 85 L. Ed. 2d 278 (1985), citing *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971).

 Measured by this standard, the application of equitable distribution principles to Union Oaks, on the facts of this case, does not violate the Establishment Clause. The State has a legitimate interest in resolving property disputes, and a civil court is a proper forum for that resolution. *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969). Not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. *Id.* The application of general law, the purpose and effect of which is to advance the State's secular goals, is valid

despite an indirect burden on religious observance. See *Braunfeld v. Brown*, 366 U.S. 599, 81 S. Ct. 1144, 6 L. Ed. 2d 563 (1961). So long as a court is not involved in resolving underlying controversies over religious doctrine, "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church*, 393 U.S. at 449. In this case, there is no dispute presented regarding Union Oaks' religious doctrine, if any, and we have applied the same well-established principles of law to Union Oaks that would be applied in any similar dispute involving a secular corporation.

Similarly, "[c]ivil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Id.* A legal determination, otherwise legitimate, "does not violate the Free Exercise Clause merely because financial detriment results." *Donovan*, 722 F.2d at 403, citing *Braunfeld, supra*. An individual's religious beliefs do not excuse the individual from compliance with an otherwise valid law regarding conduct that the State is free to regulate. See *Employment Div., Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).

Moreover, the activities of Union Oaks most at issue here relate to its commercial activity, not a course of conduct asserted to be an expression of religion. For instance, driving a Sunday school bus does not constitute a religious practice merely because the bus is owned by a religious organization, the driver is an ordained minister, and the bus is taking church members to a religious ceremony. *Wollersheim v. Church of Scientology*, 212 Cal. App. 3d 872, 66 Cal. Rptr. 2d 1 (1989), *vacated on other grounds* 499 U.S. 914, 111 S. Ct. 1298, 113 L. Ed. 2d 234 (1991). Where, as here, a nominally religious nonprofit corporation is engaged in a discrete commercial enterprise, it subjects itself to the same general rules of law otherwise applicable to such enterprises. See, generally, *Tony & Susan Alamo Foundation v. Sec'y of Labor, supra*.

The application of general rules of family law and corporate law to a situation involving a religious corporation offends neither the Establishment Clause nor the Free Exercise Clause. Without inquiry into the legitimacy of Union Oaks' religious

activities, we conclude that on the facts presented, the corporate veil of Union Oaks may be pierced without violating the First Amendment to the U.S. Constitution.

### JURISDICTION OVER UNION OAKS

Finally, Buddy argues that the district court and this court cannot dispose of Union Oaks' assets because Union Oaks was not made a party to the proceedings. It should be noted that Linda sought to have Union Oaks joined as a party, but that Buddy successfully persuaded the district court not to join Union Oaks. It is a general rule that a party cannot complain of error which that party has invited the court to commit. *Schrempp and Salerno v. Gross*, 247 Neb. 685, 529 N.W.2d 764 (1995).

In any event, however, the interests of Union Oaks were adequately represented in the district court by Buddy, Union Oaks' alter ego. A nonparty may be bound by an equitable judgment sustaining an alter ego action if the party's interests are so closely affiliated with the nonparty's interests that the interests are merged. See, e.g., *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S. Ct. 619, 50 L. Ed. 2d 530 (1977); *Valley Finance, Inc. v. United States*, 629 F.2d 162 (D.C. Cir. 1980); *In re 1438 Meridian Place, N. W., Inc.*, 15 B.R. 89 (D.C. 1981), *Sample v. Sample*, 152 Ariz. 239, 731 P.2d 604 (Ariz. App. 1986); *Lyons v. Lyons*, 340 So. 2d 450 (Ala. Civ. App. 1976). In order for a corporation to be accorded treatment as a separate legal entity, it must exist and function as such and not merely as the alter ego of a person controlling it. See *Lyons, supra.* Clearly, there can be no argument here that Union Oaks was without notice or will be deprived of any substantive rights, where it was on notice of the relief requested by Linda and where it was brought before the court in the person of its alter ego, Buddy.

### VALUATION AND DIVISION

As previously stated, equitable property division under § 42-365 is a three-step process. The first step is to classify the parties' property as marital or nonmarital. *Gibilisco v. Gibilisco, ante* p. 27, 637 N.W.2d 898 (2002). We have concluded that assets which came into Union Oaks during the time of the parties' marriage were in fact part of the marital estate and subject to division upon dissolution.

The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Gibilisco, supra.* Having determined that Union Oaks' assets are part of the marital estate, it remains to value and divide those assets between the parties.

Although the district court did not include the assets of Union Oaks in the marital estate, it did state, for the record, the value of Union Oaks. The court concluded that the value of Union Oaks had grown to approximately $1.3 million. This court, like the district court, is somewhat frustrated in an attempt to place a more precise value on Union Oaks' assets, due to Union Oaks' questionable fiscal discipline and Buddy's reticence to answer even the most basic financial questions. Nonetheless, the district court's figure of $1.3 million is supported by the record and is perhaps even somewhat conservative, given that Union Oaks' real estate holdings, cash assets, and accounts receivable, by themselves, added up at the time of trial to just under $1.02 million. On a de novo review of the record, we find no basis for concluding that the district court's valuation of Union Oaks' assets, at $1.3 million, constituted an abuse of discretion, and we conclude that the valuation is proper in all respects. Cf. *Bryan v. Bryan*, 222 Neb. 180, 382 N.W.2d 603 (1986) (appellate court will affirm trial court's valuation of closely held corporation if such method of valuation has acceptable basis in fact and principle).

Appeals in domestic relations matters are heard de novo on the record, and thus, an appellate court is empowered to enter the order which should have been made as reflected by the record. *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001). In this case, however, we find the record is too stale for this court to attempt an in-kind distribution. See *Kellner v. Kellner*, 8 Neb. App. 316, 593 N.W.2d 1 (1999). While this appeal was pending, Union Oaks may have engaged in further commercial activity, thus changing the manner in which Union Oaks' assets are held, or Union Oaks' board of directors may have asserted its authority in some manner.

We note that action by Union Oaks' board of directors, even the removal of Buddy from his position of control over the

corporation, would not affect the equitable remedy to which Linda is entitled, because Union Oaks was the alter ego of Buddy at all relevant times during the marriage and the assets acquired by Union Oaks during the marriage are properly considered marital property. Nonetheless, absent current information regarding Union Oaks' assets, we cannot appropriately exercise our appellate power to enter an order equitably dividing the marital estate; under the circumstances, the equitable division of the marital estate is properly committed to the discretion of the district court based upon the principles expressed in this opinion.

Consequently, we reverse the district court's judgment with respect to property division, except that we affirm the district court's judgment with respect to the $50,000 note from Union Oaks to the Medlocks and the automobile awarded to Linda. We remand the cause to the district court with directions to distribute those assets of Union Oaks as may be necessary to equitably divide the marital estate. We do not comment on whether cash payment or in-kind distribution will be the appropriate means for such distribution, but instead entrust the details of the distribution to the district court's discretion based upon the evidence presented.

We also recognize that the district court's alimony award and award of attorney fees may now change given the substantially altered circumstances presented by our resolution of this appeal. The record reveals that some of the real estate held by Union Oaks was income producing, and the possible transfer of these income-producing assets may alter the equities involved in the award of alimony. See, *Ritz v. Ritz*, 229 Neb. 859, 429 N.W.2d 707 (1988); *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001); *Hafer v. Hafer*, 3 Neb. App. 129, 524 N.W.2d 65 (1994). Similarly, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995); *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). Thus, we also reverse the district court's awards of alimony and attorney fees. We specifically do not find that the district court abused its discretion in entering those awards; rather, we simply direct the district court to reconsider the issues

of alimony and attorney fees in light of the changed circumstances of the division of marital property between the parties.

## CONCLUSION

The district court's judgment regarding division of marital property, alimony, and attorney fees is reversed, with the exceptions noted above. The district court's dissolution decree is affirmed in all other respects. The cause is remanded to the district court with directions to equitably divide the marital estate, including the assets of Union Oaks, valued at $1.3 million, and revisit the issues of alimony and attorney fees in light of the property division.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.