IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

REEVES V. REEVES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SHAWN E. REEVES, APPELLANT,

V.

BRENDA J. REEVES, NOW KNOWN AS BRENDA J. CULVER, APPELLEE.

Filed February 7, 2023.    No. A-22-031.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Wayne E. Janssen, for appellant.

Terrance A. Poppe and Anne E. Brown, of Morrow, Poppe, Watermeier & Lonowski, P.C., for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Shawn E. Reeves appeals the decree of dissolution of marriage entered by the district court for Lancaster County that dissolved his marriage to Brenda J. Reeves, now known as Brenda J. Culver. Shawn assigns that the district court erred in determining that the corporation of which he is the only officer and director, is his alter ego and in including the corporation's assets in the marital estate. Shawn challenges the district court's determination and division of the marital estate in several regards. Shawn also assigns error to the district court's awarding alimony, attorney fees, and expert witness fees to Brenda. We conclude that the district court did not abuse its discretion in dividing the property between the parties and in ordering Shawn to pay various fees, and we affirm.

- 1 -

## II. STATEMENT OF FACTS

Shawn and Brenda were married in August 2003. It was the second marriage for both of them, and no children were born of this marriage. The parties separated, and Shawn filed a complaint for dissolution in September 2016. Between September 2016 and December 2018, both Shawn and Brenda filed various motions related to discovery including notices to take depositions, requests for production, and written interrogatories. Both parties also filed motions to compel in response to a perceived failure by the other party to fully comply with the discovery proceedings.

### 1. PRETRIAL PROCEEDINGS RELATED TO CORPORATION

Shawn incorporated Kinetic Systems, Inc. (Kinetic), a computer consulting firm, with another officer and director in October 1996. Kinetic purchased two airplanes during the parties' marriage, a Cessna 310R in 2013 and a Cessna 421B in 2016. The record reflects contentious discovery proceedings, with both Brenda and Shawn filing many motions related to the process of appraising the two planes.

On February 5, 2019, Brenda filed a motion requesting that the district court order Shawn to make available all planes owned by Shawn, or by a corporation in which Shawn has an ownership interest. On February 26, the court sustained Brenda's motion and ordered Shawn to make both the Cessna 310R and the Cessna 421B available for inspection and appraisal within 14 days.

On March 4, 2019, Shawn filed a motion to limit Brenda's appraisal to either a desktop appraisal of both planes, or to require Brenda to pay the reasonable cost incurred by Kinetic in complying with the district court's order to make the planes available. The motion also requested that Brenda pay any costs prior to the appraisal. On the same day, Brenda filed a motion to continue the trial then set to begin March 25. Brenda noted that she had hired a professional to complete certified appraisals of the planes, which was estimated to take 3 days. Due to Shawn's motion to limit the appraisals to desktop appraisals, Brenda anticipated that the appraisals of the planes would not be completed prior to trial.

On March 8, 2019, a hearing was held on Shawn's motion to limit the plane appraisals and Brenda's motion to continue. Shawn indicated that the planes would be available on March 11 and for 3 days afterwards, and requested that the district court prohibit the appraiser from making any intrusion into the body or mechanics of the planes. Brenda argued that it was not appropriate to limit the method of inspection without first discussing the issue with the appraiser. Although no order is contained in our transcript, the court ruled from the bench that its February 26 order requiring that Shawn make the planes available was vacated and ordered that discovery be conducted pursuant to the relevant statutes. The court indicated that Brenda should issue a Rule 6-334(A) subpoena, which would subject a nonparty to ancillary discovery, to access the planes for appraisal. The court stated that it would not set a new trial date until discovery was completed, and granted Brenda's motion to continue.

On April 11, 2019, Shawn filed an objection to Brenda's notice of intent to serve a Rule 6-334(A) subpoena on both Shawn and Kinetic. The intended subpoena attached to the notice sought the production of the two planes as well as all electronically stored information, with the property to be made available in Lincoln on or before May 13-15. Shawn alleged that Brenda's notice of intent to subpoena Kinetic was improper because the appraisal of the planes would violate

the rights of the other stockholder and would lead to the exposure of trade secrets. Shawn also contended that he had made the planes available for 3 days in March but that Brenda had refused to supply the necessary costs upfront, and so the appraisal had not occurred. Shawn noted that he had taken time from work and traveled to Nebraska for the occasion, as the planes were stored at the Lincoln Airport. Shawn also alleged that he had a work conflict on the dates specified in the subpoena. Shawn further stated that Brenda "neglected her opportunity to carry on this discovery when such discovery could have been done without extra personal cost and burden" to Shawn, as he had been living in Nebraska at the start of the dissolution proceedings. Shawn requested that Brenda pay Shawn at least $5,000 to compensate him for the "extra burden imposed. . ."

On April 16, 2019, Brenda filed a motion to compel Shawn to produce the two planes, and any electronically stored information related to the planes, on May 13-15 for appraisal.

In an order filed on May 13, 2019, the district court indicated that a hearing had been held on Shawn's objection to notice of intent to serve a Rule 6-334(A) subpoena and on Brenda's motion to compel. A bill of exceptions from this hearing is not included in our record. The court overruled Shawn's objection and ordered that the subpoena should be issued. The court also overruled Brenda's motion to compel.

On June 24, 2019, Brenda filed another motion requesting that the district court set a date and place for Shawn to produce the planes for appraisal.

In an order filed on August 7, 2019, the district court indicated that a hearing had been held on Brenda's motion regarding plane appraisals. Again, a bill of exceptions from this hearing is not included in our record. The court sustained Brenda's motion and ordered Shawn to produce both planes for inspection and appraisal, including any and all electronically stored information related to the planes. The court ordered that Shawn make the planes available to Brenda and her appraiser on September 12-16, "at the location where the aircraft are normally located or stored." The court noted that costs related to the completion of the inspection and appraisal would be addressed at trial.

On February 17, 2020, Brenda filed an application for an order to show cause. Brenda alleged that Shawn had failed to obey the district court's February 26, 2019, and August 7 orders to make the planes available for inspection and appraisal during the dates prescribed by the court.

In an order filed on March 5, 2020, the district court noted that it had previously continued the trial a year prior, on March 8, 2019, because discovery had not yet been completed. Since March 8, 2019, the parties had involved the court in at least seven discovery disputes. Based on the court's March 8 directive, and the failure of the parties to comply, the court ordered that discovery would be closed at the date of the order and that all pending discovery would be addressed at a hearing on March 25, 2020. The court also ordered that Shawn appear on that date in connection with the show cause proceeding.

On March 24, 2020, Shawn and Brenda filed a stipulation for continuance. The parties alleged that because of the national emergency caused by the COVID-19 pandemic, the deadline for completing the appraisals of the planes should be continued to April 30 and the hearing on the order to show cause should be continued to May 27. On March 27, the district court filed an order adopting the continuances proposed by the parties in their stipulation. Brenda subsequently sought to vacate the show cause order which the court granted.

On June 11, 2020, Brenda renewed her motion requesting that the district court set a date and place for Shawn to produce the planes for appraisal. In an order filed on June 26, the court indicated that a hearing on the matter had been held on June 24. A bill of exceptions from this hearing is not included in our record. The court sustained Brenda's renewed motion and ordered that Shawn make the planes available "at the same time, in the same place, for a period of not less than 48 hours." The court also ordered that the appraisals take place between June 30 and July 20. The court noted that failure to comply with its order may result in sanctions.

On July 13, 2020, Shawn filed a certificate of delivery which stated that on July 11, he had given Brenda's attorney notice that both planes would be available for appraisal "at the same location" in Georgia from July 13 to July 15.

On August 5, 2020, Brenda filed a motion to appoint an expert witness, alleging that Shawn had failed to make the planes available at the time provided by Brenda, during which Brenda had made Shawn aware that her appraiser would be in Lincoln. Instead, Shawn had made the planes available in Georgia during this provided time. Brenda then requested that the court appoint Brenda's appraiser, Mark Parry, as an expert witness in the proceedings.

The following day, Brenda filed a motion for sanctions. In her motion, Brenda alleged that on July 9, 2020, her attorney sent Shawn's attorney an email notice to complete the court-ordered appraisal of the planes in Lincoln between July 14 and 16. Brenda's attorney also stated in the email that Parry would be traveling to Lincoln to complete the appraisal at that time. After receiving no response from Shawn's attorney, the following day Brenda's attorney called and left a voicemail for, and sent another email to, Shawn's attorney. On July 11, a Saturday, Shawn's attorney sent an email to Brenda's attorney stating that the planes would be available for appraisal between July 13 and 15 in Georgia. Brenda further alleged in her motion that Parry was present in Lincoln from July 14 to 16, but that Shawn failed to produce the planes for appraisal. Brenda paid Parry $3,500 for his travel to Lincoln, though no appraisal occurred. Brenda asked the district court for attorney fees and costs associated with the appraisal arranged to occur between July 14 and 16, that Shawn be ordered to produce the planes in Lincoln at a specific date and time, and for further sanctions as the court would deem equitable. Brenda attached the email correspondence between the parties' attorneys to her motion.

In an order filed on August 17, 2020, the district court indicated that a hearing on Brenda's motions to appoint an expert witness and for sanctions was held on August 13. A bill of exceptions from this hearing is not included in our record. The court overruled Brenda's motion to appoint Parry as an expert witness, but sustained her motion for sanctions. The court ordered Shawn to pay Brenda $3,500 for costs associated with the scheduled July appraisal by August 27. Shawn was also ordered to deliver electronic copies of the flight logbooks for each plane to Brenda's attorney by August 21.

On August 20, 2020, Shawn filed a motion to vacate the order of sanctions, arguing that the district court's August 17 order imposing sanctions was based on incomplete evidence and an incorrect application of the law. Shawn also requested an order requiring Brenda to compensate Shawn for the costs he incurred in complying with "such order." The court did not rule on this motion, but addressed the issue of sanctions in its posttrial orders.

- 4 -

## 2. TRIAL

A 4-day trial was held over August 31, September 1, and November 2, 2020, and February 23, 2021. The following evidence was adduced. Additional details of the trial evidence are referenced as necessary in our analysis.

### (a) Brenda's Employment History

At the time of the parties' marriage in 2003, Brenda was employed at the Lincoln Women's Clinic. However, not long after, Brenda quit the position because Shawn wanted her to be a stay-at-home mother. Brenda had three children from her previous marriage, who resided with the parties during the marriage. Shawn also had three children from his previous marriage, who primarily resided with their mother but would stay with the parties during their frequent visitation. At the time of the dissolution, all of the children had reached the age of majority.

Shawn disagreed that he interrupted Brenda's career progression, stating that he had not forced her to stop working in order to care for their respective children. Shawn also noted that the children were of school age during the marriage, and did not need to be cared for at home during the day by a parent.

In 2007, Brenda went to nursing school and incurred approximately $20,000 in student loan debt, which she was making payments on at the time of trial. Brenda received her Practical Nursing Diploma in 2008. Brenda worked in various healthcare settings before beginning her current position as a licensed practical nurse for the Lincoln Family Medical Group in February 2019. Brenda earns an annual salary of $59,000.

### (b) Shawn's Employment History

Shawn testified that he and Colin McGuire incorporated Kinetic in October 1996. Shawn and McGuire served as directors and officers of the corporation until August 2002, when McGuire resigned as a director and officer but retained ownership of his Kinetic stock. McGuire had not received any dividends or salary from Kinetic since his resignation.

At Kinetic's largest, the corporation employed 16 people including Brenda, prior to the parties' marriage, who worked briefly as a receptionist. At the time of trial, Shawn was the sole director and officer of Kinetic, and as such, had exclusively made business decisions and issued checks on Kinetic's behalf for at least the last 15 years. Shawn was also in the process of moving Kinetic to Georgia. He did not discuss moving the corporation with McGuire.

Though Kinetic had not paid a dividend since 2003, Shawn received an annual salary from the corporation for many years. W-2 forms entered into evidence reflect that Shawn earned a $48,000 salary from Kinetic in 2016, $12,000 in 2017, and $1,500 in 2018. Shawn has never discussed the amount of his salary with McGuire and acknowledged that all annual net income of Kinetic was paid to Shawn as a salary.

Shawn did not provide Brenda or her attorney with any of Kinetic's tax returns, asserting that he had only been subpoenaed as an individual and not as an officer of the corporation. In a 2018 deposition, Shawn stated that as of July 31, 2016, there was $8,000 in a bank account owned by Kinetic and $13,293 in Kinetic's accounts receivable. Shawn testified that those balances no longer existed at the time of trial.

Shawn started working at Silverhawk Aviation as a pilot in April 2017, at which time his work with Kinetic was dramatically reduced, as reflected in his diminished corporate salary. Shawn was no longer earning a salary from Kinetic at the time of trial.

In August 2018, Shawn began working as a pilot for Air Wisconsin Airlines, earning a guaranteed annual salary of approximately $41,000. Shawn testified that he suffered a reduction in income when he accepted this new position, but that his reduced income was expected to last only 2 or 3 years. Shawn's 2019 W-2 form reflects that he earned approximately $75,000 from Air Wisconsin Airlines, and Shawn testified that in 2019 he was paid one-time bonuses which he would not be receiving in the following years. Shawn's 2018 W-2 forms reflects earnings of approximately $17,000 from Air Wisconsin Airlines and $58,000 from Silverhawk Aviation, and his 2017 W-2 form reflects earnings of approximately $65,000 from Silverhawk Aviation.

For many years, Shawn also received $1,650 in monthly rent from Kinetic for the corporation's use of property purchased during his marriage to Brenda. Shawn continued to receive rental payments from Kinetic through 2017, though that amount is not reflected in his tax returns from 2007 to 2017.

### (c) Kinetic's Planes

Prior to Shawn's marriage to Brenda, Kinetic owned an airplane to service customers who lived outside of Lincoln. The original airplane was damaged in an accident, and Kinetic purchased a Cessna 310R for $33,000 as a replacement plane in 2013. Kinetic later purchased another plane in 2016, a Cessna 421B, for $75,000.

The Cessna 310R's registration application history was entered into evidence. The documents detailed the plane's title and lien history at the time Shawn purchased the plane on Kinetic's behalf in 2013. There were eight recorded liens, entered between 1981 and 2012, on the Cessna 310R totaling over $1,000,000. While the registration application history does not state whether the liens have been released, several lien releases which were signed and dated in 2013 were entered into evidence by Brenda. The only lien on the Cessna 310R without evidence of release was one made in 1981 for an unrecorded amount.

The Cessna 421B's registration application history was also entered into evidence. At the time Shawn purchased the plane on Kinetic's behalf in 2016, there was one recorded lien on the Cessna 421B for $131,250. The registration application history does not state whether the lien has been released, but a separate lien release signed and dated in 2020 was received in evidence. Shawn also testified that he has never paid any part of a lien on either plane, and had never received a demand from anyone with respect to any plane liens.

Shawn testified that he personally loaned Kinetic $75,000 for the purchase of the Cessna 421B. According to Shawn, the source of the purchase funds was from a personal injury settlement. A loan agreement, signed by both Shawn personally and Shawn as director of Kinetic, states only that the $75,000 was to be loaned by Shawn as "The Lender," and does not detail the source of the funds. Shawn did not discuss purchasing either plane with McGuire.

Brenda testified that she flew on both of the planes with Shawn "many times." Brenda and Shawn would fly to Georgia "for fun" and to see the property the couple had purchased there during their marriage. They also flew to New York, Missouri, Pennsylvania, and Indiana to visit family and friends. Brenda stated that when the parties would discuss divorce, Shawn told Brenda

that he had "everything buried so deep in Kinetic that there's no way I would get anything, and he would bury me in paper."

Mark Parry, a senior certified appraiser with the National Aircraft Appraisers Association, was retained by Brenda to appraise the Cessna 310R and the Cessna 421B. Parry testified that he had an engagement agreement with Brenda that the planes would be available in Lincoln, along with their logbooks, for an appraisal. Parry traveled from Massachusetts to Nebraska on three occasions to appraise the planes, however each time he was informed that the planes would not be available and no appraisal was conducted.

Parry later conducted a market analysis in order to provide the district court with a valuation range for the two planes. Parry utilized several resources in his market analysis including the aircraft dealer network database, the Aircraft BlueBook, and interviews with mechanics who had performed work on the planes. Parry also looked at some of the logbooks for the planes, but because he had been given a digital copy of the physical logbooks, he was unsure if he was reviewing the complete flight records. Parry valued the Cessna 310R between $179,000 and $206,000, and valued the Cessna 421B between $260,506 and $299,000. Parry's valuations, which were higher than the purchase price for either plane, accounted for the electronic and equipment updates Shawn made to the planes.

Shawn testified to his own valuation of the planes, including describing upgrades he made to the planes' interior and machinery. Shawn's own Aircraft BlueBook valuation, which valued the Cessna 310R at $23,334.05 and the Cessna 421B at $84,085.95, was entered into evidence. Shawn also conducted a search for a plane similar to the Cessna 421B on an online auction site and offered price information from the auction as evidence of the Cessna 421B's valuation. However, the district court sustained Brenda's hearsay objection and the auction site information was not received by the court.

Shawn believed that Kinetic had to have been served with the appropriate subpoena in order for Brenda to gain access to the planes for the purposes of appraisal, and that service on himself did not constitute service on his corporation. Shawn maintained that he has made the planes available on 19 occasions for a least 25 days and that the planes had been hangered in the Lincoln Airport for years.

At the time of the district court's June 2020 order, the Cessna 421B had been moved to Georgia and the Cessna 310R was still in Lincoln. Shawn determined that it would be most efficient and cost effective to have both planes in the same place, so he moved the Cessna 310R to Georgia in July when his hangar lease at the Lincoln airport expired. Shawn was living in Georgia and he intended to keep the planes there for Kinetic's use. Further, Shawn's work schedule would not have allowed for the amount of time it would have taken to bring the Cessna 421B back to Lincoln and then move both planes to Georgia before his hanger lease expired. Shawn noted that the district court's June 2020 order to make the planes available did not state that Brenda would be the party to select the location or time for the appraisals.

Brenda testified that when Shawn provided her with dates that the planes would be available for appraisal, there was not enough notice to coordinate Parry's schedule and travel.

Shawn expressed doubt that Parry would leave Massachusetts before receiving confirmation of the location of the planes. Though Shawn did not inform Brenda about his plan to

move the Cessna 310R, he did communicate with Brenda's counsel once the planes were both in Georgia, a few days before Parry's scheduled appraisal.

Shawn testified that he made copies of the planes' logbooks; roughly 26,000 pages. Shawn estimated that he spent over 52 hours copying and digitizing the logbooks, and that it cost him $1,874.60, plus $50 an hour for his own labor, for a total of $4,483.10. Shawn asked the district court to award him the cost of digitizing the logbooks and to vacate its order for sanctions.

Brenda's proposed financial plan was entered into evidence. The plan requested Shawn pay $10,000 in attorney fees, $22,100 in fees for Parry, and $600 in fees for property appraisals.

### (d) Real Property

At the time of the marriage, Brenda owned a home on Newgate Court in Waverly, Nebraska (Newgate Court). In September 2002, a little less than a year before the parties were married, a hail storm caused damage to Newgate Court and Brenda received a homeowner's insurance settlement of $8,656.45 to make repairs. Brenda endorsed the settlement check over to Shawn because Shawn had informed Brenda the previous day that he was going to lose his home on South 56th Street in Lincoln (56th Street) unless he paid overdue property taxes within 24 hours. A copy of the settlement check was entered into evidence and the back of the check displays Brenda's endorsement to Shawn. Also on the back of the check is a Union Bank deposit stamp. Brenda did not have an account at Union Bank at the time, and because she and Shawn were planning to get married, they planned to use "marital money" to repair Newgate Court.

Shawn moved in to Newgate Court after the parties were married in 2003. Shawn never repaid Brenda the $8,656.45 to repair Newgate Court, but he did replace the siding on the front of the house. However, the damaged siding on the remainder of the house, the roof, and the broken windows were never repaired during the marriage. Since Brenda and Shawn separated in 2016, she has completed all necessary repairs to Newgate Court. Brenda's father loaned her $3,000 in 2017 to replace the roof of Newgate Court and Brenda's son loaned her a total of $24,051 in 2020 for general repairs to Newgate Court.

Shawn agreed that Brenda endorsed her settlement check to him to pay the property tax arrearage on 56th Street, but stated that he worked extensively on Newgate Court and that the repairs he performed equaled or exceeded the amount of money Brenda had given him to pay his property taxes.

Shawn was added to the title of Newgate Court by quitclaim deed in 2006. A 2006 deed of trust related to Newgate Court reflects that Brenda, Shawn, and Brenda's parents all signed a promissory note for $80,215. Shawn testified that he has made all of the mortgage payments on Newgate Court from 2006 until July 2020. Shawn recently placed Newgate Court's mortgage into forbearance because he was no longer able to afford the $900 monthly payment. Shawn did not inform Brenda that he was placing the mortgage of her home into forbearance.

A certified real estate appraiser inspected Newgate Court in October 2018 and appraised the home for $168,000. Shawn testified that at the time of the marriage in 2003 the mortgage balance on Newgate Court was $80,125, and at the time the parties separated in 2016 the mortgage balance was $67,850. No other documentation as to Newgate's mortgage balance was offered.

Shawn's premarital home on 56th Street was sold during the marriage for a profit of approximately $35,000. These funds were deposited into a Hastings State Bank account in

Shawn's name and applied to the mortgage of an acreage on Waverly Road in Lincoln (Waverly Road), purchased during the marriage. From the same bank account Shawn paid "multiple bills, house payments, insurance, discretionary spending stuff."

The parties also purchased a property in Townsend, Georgia during the marriage.

(e) Shawn's Personal Injury Settlements

Shawn testified that he was in a car accident in 2012 and a settlement sheet reflects that he received net proceeds of $73,746.47 from a personal injury settlement. Included in the itemized list of damages in Shawn's demand letter is $573.50 attributed to Brenda's lost income for accompanying Shawn to medical appointments. Shawn also made a claim under his own underinsured motorist coverage and a settlement sheet reflects that he received $87,516.86 net proceeds from that claim. Shawn described Brenda's involvement in his recovery as minimal, testifying that she drove him to his first two appointments and occasionally brought him ice packs and pain relievers. Brenda testified that she nursed Shawn at home, prepared his meals, purchased a recliner for Shawn to sleep in, and cared for his children during his recovery. Shawn was involved in another car accident in 2013 and received $9,000 in net proceeds from a personal injury settlement.

Shawn deposited the funds from his personal injury settlements into the Hasting State Bank account. With the money in the account Shawn testified to paying off the loan on Waverly Road ($78,509.93), loaning money to Kinetic for purchase of the Cessna 421B ($75,000), purchasing a Friesian stallion ($14,000), making a down payment on a 2013 Ford F-250 ($5,000), and paying "thousands" in regular household expenses.

(f) Miscellaneous Property

Brenda and Shawn testified regarding four horses owned during the marriage. A Friesian gelding had been purchased by Brenda's former husband, and a Friesian sport gelding and a quarter horse had been purchased during the marriage. Shawn testified that a Friesian stallion had also been purchased during the marriage with funds from his personal injury settlement. All but the quarter horse were living with Shawn in Georgia at the time of trial. Shawn gave the quarter horse away, as he determined the horse was not sellable. Shawn did not discuss giving the horse away with Brenda. Brenda testified that she has not seen the horses since she and Shawn separated in 2016.

Shawn estimated that the Friesian stallion was worth between $15,000 and $16,000, and the other horses were worth "a couple thousand dollars." Brenda estimated the Friesian stallion was worth $14,000, the Friesian gelding was worth $7,000, the Friesian sport gelding was worth $3,000, and the quarter horse was worth $2,000.

Shawn also sold two vehicles and a baler purchased during the marriage for a profit of approximately $10,000, which Shawn used to make payments towards the marital debt including "a house payment and various other bills." Brenda testified to having no knowledge of these sales or what Shawn did with the proceeds.

### 3. DECREE

The district court entered a decree of dissolution of marriage on October 5, 2021. The court made an explicit credibility finding, noting that after having had the opportunity to observe the witnesses and their demeanor, and listen to their testimony, the court determined that Shawn's testimony lacked credibility. The court referenced as examples of why Shawn was not credible, his failure to inform Brenda that he had placed their mortgage payments in abeyance, his refusal to answer questions related to Kinetic, "the obvious gamesmanship regarding the aircraft appraisals," and his liquidation of marital assets.

The district court also found that Kinetic was an alter ego of Shawn due to the evidence that Shawn operated Kinetic by himself after McGuire's departure from the corporation. The court determined that Kinetic's two planes were part of the marital estate. The court accepted Parry's opinion as to the value of the two planes, finding the value of the Cessna 310R to be $191,000 and the Cessna 421B to be $267,750, the average of the valuation ranges provided by Parry. The court did not reduce the value of the planes by any purported liens, as the court found that the evidence demonstrated that there were no such liens, and if those liens ever existed, there were never any attempts by any lien holder to contact Shawn or to seek recovery of the planes.

The district court found that Shawn failed to carry his burden of proof to support his position that several assets were nonmarital, including his three personal injury settlements and the proceeds from the sale of 56th Street. The court also determined that Brenda's $8,656 homeowner's insurance settlement should be credited to Shawn.

The district court awarded each party the household goods and personal property in their respective possession and further divided itemized personal property between the parties, crediting Shawn with Kinetic's assets, the vehicles and baler he had sold, and the four horses discussed at trial. Shawn was awarded the Georgia property and Brenda was awarded Waverly Road and Newgate Court. After dividing the property, the court ordered Shawn to make a $145,303 equalization payment to Brenda.

The district court found that this was an appropriate case for spousal support, noting that Brenda had interrupted her potential career advancement by caring for the parties' children and their family home, and that Shawn's earning capacity far exceeded Brenda's. Shawn was ordered to pay $500 in alimony to Brenda for 60 months.

Finally, the district court found that this was an appropriate case for a "substantial award" of attorney fees and expenses, and ordered Shawn to pay Brenda $9,000 for attorney fees and $15,000 for expert witness fees.

### 4. POSTTRIAL PROCEEDINGS

On October 14, 2021, Shawn filed a motion for a new trial, alleging that the district court had erred in every finding contained in the dissolution decree. A hearing on Shawn's motion for a new trial was held on November 9.

In an order entered on December 21, 2021, the district court reduced the amount of expert witness fees Shawn was ordered to pay from $15,000 to $11,500, noting that Shawn had already been ordered to pay a sanction of $3,500 in August 2020. The court overruled the remainder of Shawn's motion for a new trial.

Shawn appeals.

## III. ASSIGNMENTS OF ERROR

Shawn assigns, reordered and restated, that the district court erred in (1) finding that Kinetic was the alter ego of Shawn and including the corporation's assets in the marital estate, (2) accepting Parry's valuation of Kinetic's planes over Shawn's valuation, (3) including Shawn's personal injury settlements in the marital estate, (4) including Brenda's homeowner's insurance settlement in the marital estate, (5) including the proceeds from the sale of Shawn's premarital home in the marital estate, (6) including Shawn's nonmarital assets in the marital estate, (7) awarding Brenda alimony, (8) failing to vacate its order for sanctions and failing to award Shawn costs for production of the planes and logbooks for appraisals, and (9) awarding Brenda attorney and expert witness fees.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id*.

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. EQUITABLE DIVISION OF PROPERTY

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id*. The second step is to value the marital assets and marital liabilities of the parties. *Id*. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Id*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*.

### (a) Kinetic's Planes

### *(i) Kinetic as Alter Ego*

Shawn assigns that that the district court erred in finding that Kinetic was his alter ego and including the corporation's assets in the marital estate. Shawn argues that Kinetic was a thriving business prior to his marriage with Brenda and that all of its liabilities and assets, including its

planes and accounts receivable, are its own and belong equally to its two shareholders, Shawn and McGuire. Shawn contends that Kinetic was never made a party to the dissolution action and that including Kinetic's assets in the marital estate has deprived Shawn and McGuire of due process.

In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). A corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears. *Id*. However, in equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice. *Id*.

When a corporation is or becomes the mere alter ego, or business conduit, of a person, it may be disregarded. *Id*. Among the factors which are relevant in determining to disregard the corporate entity are diversion by the shareholder or shareholders of corporate funds or assets to their own or improper uses and the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. *Id*. When applying these equitable principles to the dissolution of marriage and the division of the marital estate, it has generally been concluded that the assets of a spouse's corporate alter ego may be considered to be, and distributed as, part of the marital estate. *Id*.

In *Medlock*, the husband made extensive personal use of corporate funds and assets, and he carried on personal dealings in the name of the corporation. The record showed a nearly complete unity of interest between the husband and the corporation. The husband enjoyed nearly unfettered control of the corporation and regularly purchased vehicles, travel, and other goods and services in the corporate name for his family's personal use. In that case, the Nebraska Supreme Court concluded that the corporation was the husband's alter ego and that its assets were included in the marital estate.

A review of case law also reveals circumstances in which our appellate courts have been unwilling to apply the alter ego theory and pierce the corporate veil in dissolution proceedings. These circumstances include that the spouse had relinquished control of the corporation during the marriage, the corporation had no value at the time of dissolution, funds exchanged between the spouse and corporation had been returned, and a lack of evidence that goods were purchased in the corporate name for personal use or that the spouse had carried on personal dealings in the name of the corporation. See, *Spady v. Spady*, No. A-15-426, 2016 WL 3252063 (Neb. App. June 7, 2016) (not designated for permanent publication); *tenBensel v. tenBensel*, No. A-11-062, 2012 WL 399882 (Neb. App. Feb. 7, 2012) (not designated for permanent publication); *Ratigan v. Ratigan*, No. A-02-333, 2003 WL 22038313 (Neb. App. Sept. 2, 2003) (not designated for permanent publication).

Applying the factors noted above, we find the situation before us to be more akin to *Medlock* than the cases which did not pierce the corporate veil. The record clearly shows that Shawn purchased assets and operated Kinetic as if it were his own personal business. Although Shawn argues that it is error to pierce the corporate veil because another shareholder exists, Shawn's own testimony at trial evidenced that he had complete control over the corporation and that McGuire has had no direct or indirect involvement in the corporation for decades. Shawn did not discuss corporate decisions with McGuire, including moving the corporation from Nebraska

to Georgia, purchasing either of the two planes, the income Shawn was paying himself out of Kinetic's profits, or the rent Shawn was paying himself for Kinetic's use of his property. Shawn has been the sole director of Kinetic, making business decisions unilaterally since McGuire's departure as director and officer in 2002. Although McGuire is still a Kinetic shareholder, he has not received a dividend or attended an annual meeting since his departure. Kinetic also appears to have ceased corporate activity since Shawn became an airline pilot in 2017.

The bulk of Shawn's complaint about treating Kinetic as his alter ego surrounds the court's inclusion of the two airplanes as marital property. Beyond Shawn's testimony that Kinetic served out-of-state clients, he has provided no other evidence that the purchase of the two planes was a corporate necessity. Little evidence was adduced by Shawn to establish Kinetic's ongoing corporate activity, and in turn, the use of the planes for corporate purposes. Shawn claimed that he loaned Kinetic $75,000 for the purchase of the Cessna 421B during the time of the parties' marriage but he presented no evidence that the corporation ever repaid him. Further, Brenda testified that the couple used the planes for personal travel, visiting family and friends in several states.

While Shawn argues that Kinetic was never made a party to the dissolution action and therefore was not required to participate in discovery, Shawn nevertheless failed to supply records or evidence to support his position that Kinetic assets should not be considered marital. Without further evidence of Kinetic's corporate activity, the district court could rely only on the testimony of the parties as to Kinetic's operation. While Shawn contends that the district court erred in concluding that he lacks credibility, we decline to disturb the court's explicit credibility findings. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Kauk v. Kauk, supra*.

Based on our de novo review, we find that the district court did not abuse its discretion by finding that Kinetic was a mere façade for Shawn's personal dealings. See *Medlock v. Medlock, supra*. Therefore, the district court did not err in distributing Kinetic's assets as part of the marital estate. This assignment of error fails.

*(ii) Valuation of Planes*

Next, Shawn assigns that the district court erred in using Parry's valuation of the Cessna 310R and the Cessna 421B, rather than his own. A trial court is not required to accept any one method of valuation as more accurate than another accounting procedure. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). In this case, the district court adopted Parry's opinion as to the range of value for the two planes, finding the value of each plane was the average of the ranges provided by Parry. This was a matter left to the sound discretion of the district court.

Parry testified that he has been in the aircraft industry for 40 years and is a senior certified appraiser with the National Aircraft Appraisers Association. Parry was unable to do a formal appraisal of the Cessna 310R and the Cessna 421B despite making three separate attempts. However, Parry did conduct a market analysis for the planes using the aircraft dealer network database, the Aircraft BlueBook, and interviews with mechanics who had performed work on the two planes. Parry also reviewed portions of the logbooks for the planes. Based on the record before us, we cannot say it was an abuse of discretion to utilize Parry's valuation range.

Additionally, the district court did not include any liens against either plane in its valuation because lien releases reflected that all but one 40-year-old lien for an unrecorded amount had been released. Shawn also testified that he had never received a demand regarding a lien on either plane. Accordingly, we affirm the court's valuation of the Cessna 310R and Cessna 421B. This assignment of error fails.

(b) Shawn's Personal Injury Settlements

Shawn assigns that the district court erred in including the proceeds of his personal injury settlements in the marital estate. He also contends that the settlement proceeds are traceable to specific items.

Before addressing this assignment of error, we summarize the applicable law regarding the classification of property. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id*. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id*. If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*.

Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021). The original capital or value of an asset may be nonmarital, while all or some portion of the earnings or appreciation of that asset may be marital. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020) (quoting *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017)). The burden of proof rests with the party claiming that property is nonmarital. *Kauk v. Kauk, supra*.

Compensation for purely personal losses is not in any sense a product of marital efforts. Compensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate. On the other hand, compensation for past wages, medical expenses, and other items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by marital partnership. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). The burden of proving that all or a portion of an injury settlement is nonmarital rests on the spouse making the claim. If the burden is not met, the presumption remains that the proceeds from the settlement are marital property. *Id*.

Shawn received three personal injury settlements from two different car accidents totaling $170,262. Shawn submitted a demand letter from his 2012 accident with an itemized list of damages. Shawn claimed medical costs incurred, future medical costs, his own and Brenda's lost wages, medical appointment mileage, and recovery equipment, totaling approximately $150,000. Shawn also claimed $300,000 in damages for past and future pain and suffering. Shawn submitted a settlement sheet disclosing the amount of the settlement and his net proceeds, but this settlement sheet was an internal document between Shawn and his attorney. Nowhere in the record is there a document issued by the insurer detailing what portions of Shawn's claim the insurer was covering.

We also note that Shawn's claim lists many items related to Brenda, such as her lost wages, the recliner which Brenda purchased the day of his surgery, and the mileage which Brenda drove while transporting Shawn to his initial appointments.

Shawn's demand letters regarding the 2013 accident provides no itemized list of damages, only a general claim for medical expenses. Likewise, the two settlement sheets offered into evidence are internal documents between Shawn and his attorney which disclose the settlement amount and Shawn's net proceeds. No communications from the insurers involved in the 2013 accident were offered to the district court.

Without documentation from the insurers which paid Shawn's three personal injury settlements, we are unable to determine whether the proceeds, or any portion thereof, should have been excluded from the marital estate. In the itemized demand letter from 2012, Shawn claimed compensation for past wages and medical expenses, which should equitably be included in the marital estate. See *Marshall v. Marshall, supra*. Shawn also claimed compensation directly related to Brenda and her care for Shawn in his recovery. And, although Shawn claimed damage for his personal pain and suffering, the amount of the 2012 settlement was not sufficient to compensate him for all of his claimed damages. Shawn's 2013 demand letters likewise reference medical expenses. Therefore, we find that Shawn has not met the burden of proving all or a portion of his personal injury settlement is nonmarital, and as such we presume the proceeds are marital property.

Shawn also argues that his personal injury settlement proceeds are traceable to the payment of debt and purchase of property already included in the marital estate. Shawn testified that he deposited the settlement proceeds into a Hastings State Bank account in his own name. He then claims to have used these proceeds to pay off the loan on Waverly Road, to loan money to Kinetic for purchase of the Cessna 421B, to purchase a Friesian stallion, and to make a down payment on a 2013 Ford F-250.

However, Shawn provided little documentation to support these assertions. The loan agreement which provided Kinetic with the funds to purchase the Cessna 421B states only that $75,000 was being loaned by Shawn and does not detail the source of those particular funds. Shawn offered the loan payoff statement for Waverly Road, which indicates the funds were drawn from Shawn's Hastings State Bank account. However, Shawn also deposited other money and paid household expenses during the marriage from the same bank account. Shawn's bank records entered into evidence reflect that his Hastings State Bank account was used during the marriage to purchase groceries, home goods and furnishings, hardware supplies, and streaming and delivery subscriptions in addition to various recurring household bills. A state and federal tax refund and periodic checks were also credited to the account. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021). Finally, Shawn offered no documentation relating to the Friesian stallion or the Ford F-250, only his testimony that those items were purchased with settlement funds. The district court made an explicit finding that Shawn's credibility regarding purchases made with his settlement proceeds was lacking. See *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than other).

Even if any portion of Shawn's personal injury settlements was nonmarital property, because Shawn paid off the Waverly Road loan and loaned Kinetic money out of the same bank account from which he conducted many other marital transactions, we find that the settlement funds have become inextricably mixed with marital property. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Shawn has not proved that any part of his personal injury settlements were nonmarital, and even if any portion could be construed as nonmarital, as discussed above, such funds were inextricably mixed with marital property and thus became marital property. The district court did not abuse its discretion by including the proceeds in the marital estate. This assignment of error fails.

### (c) Brenda's Homeowner's Insurance Settlement

Shawn assigns that the district court erred in including Brenda's homeowner's insurance settlement of $8,656 in the marital estate. Shawn argues that the insurance settlement was a gift from Brenda to Shawn before they were married, and therefore is nonmarital property. He also argues that any repairs he performed on Newgate Court far exceeds the insurance settlement proceeds.

Brenda received the homeowner's insurance settlement for hail damage to Newgate Court in 2002, 1 year before the parties married. Brenda endorsed the settlement proceeds over to Shawn, and the check was then deposited into a bank account owned by Shawn. Both parties agree that the insurance proceeds went to pay overdue property taxes on 56th Street, Shawn's premarital home.

While Shawn describes Brenda's endorsement of the settlement check over to him as a gift, Brenda's testimony makes it clear that she made the endorsement because she and Shawn planned to marry and make repairs to Newgate Court, which would serve as their marital home. While Shawn did replace the siding on one portion of the home, Brenda described many repairs which were not timely made. Brenda submitted evidence that she had borrowed thousands of dollars from her father and son to make repairs to Newgate Court in 2017 and 2020. Because repairs to the home had not been made for several years after the initial hail damage, Newgate Court had further deteriorated and required more extensive and costly repairs.

Given the circumstances of this case, we find that the district court did not abuse its discretion by including Brenda's homeowner's insurance settlement of $8,656 in the marital estate. See *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020) (ultimate test in determining appropriateness of division of property is fairness and reasonableness as determined by facts of each case). This assignment of error fails.

### (d) Proceeds From 56th Street

Shawn assigns that the district court erred in including the profits from the sale of 56th Street in the marital estate. Shawn asserts that he used the $35,000 profit from the sale of the home to make $29,500 in improvements to Waverly Road and a $5,500 down payment on the property in Georgia. Shawn testified that he deposited the $35,000 sale proceeds from 56th Street into his Hastings State Bank account.

As we noted above, Shawn also testified to using that same account during the marriage to deposit money and pay marital expenses, thus causing the account to lose its separate character.

Further, though documents in evidence reflect a difference between the purchase price and principal amount on the mortgage notes of $29,500 for Waverly Road and $5,500 for the Georgia Property, without more complete accounting we are unable to determine whether Shawn used nonmarital property to make these payments. We find that the district court did not abuse its discretion in including the proceeds from the sale of 56th Street in the marital estate in light of Shawn's failure of proof. This assignment of error fails.

(e) Inclusion of Nonmarital Assets

Shawn's last assignment of error related to the division of property is that the district court erred in general by including Shawn's nonmarital assets in the marital estate. Specifically, Shawn argues that he was not credited for his nonmarital horses, for marital debt paid since separation, and for marital property sold to pay marital debt. Shawn also argues that the Kinetic accounts did not have cash balances at the time of trial, despite the district court including the balances from 2016 in its decree. We address each in turn.

(i) Horses

In its decree, the district court found that a Friesian stallion ($14,000), a Friesian gelding ($7,000), a Friesian sport gelding ($3,000), and a quarter horse ($2,000) were marital property. Shawn testified to purchasing the Friesian stallion in 2016 using his personal injury settlement. The Friesian gelding was purchased by Brenda's former husband as a gift to Brenda's daughter. The Friesian sport gelding was purchased during the marriage. All three of these horses are in Shawn's possession in Georgia. The quarter horse was purchased during the marriage and Shawn gave the horse away without consulting Brenda.

Shawn cites to *Shafer v. Shafer*, 16 Neb. App. 170, 741 N.W.2d 173 (2007), in which we held that animals in a herd of cattle owned by the husband prior to marriage should remain his nonmarital property even if the actual animals in the herd had changed. However, the only evidence in the record regarding horses owned by Shawn prior to the marriage was testimony by his father who noted that Shawn has owned "several horses" for "many years," including before his marriage to Brenda. No documentation regarding the value of these horses was entered into evidence, though both Shawn and Brenda testified to their estimated value. When asked to describe the changes in the horse makeup since his marriage to Brenda, Shawn responded that "I've had several horses die. We gave two horses away, sold one for around $650, had one pass away that I replaced, and gave another one away."

All four horses at issue were acquired during the marriage, and three of the horses are in Georgia with Shawn. The other horse was given away by Shawn without consultation with Brenda. Shawn has failed to prove that any of these horses should be considered nonmarital property. We find that the district court did not abuse its discretion by including the horses in the marital estate. Further, we defer to the district court's valuation of the horses based on Brenda's testimony. See *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

(ii) Marital Debt Paid Since Separation

Shawn argues that he made extensive payments on the marital debt from his own earnings after he and Brenda separated in 2016. Shawn contends that he made mortgage payments and paid

- 17 -

taxes on Waverly Road, Newgate Court, and the property in Georgia which were not reflected in the district court's decree. Shawn offered only two receipts reflecting payments made regarding the Georgia property, both of which lists Brenda's name next to his as the payee and property owner. Little accounting has been provided to support Shawn's testimony regarding the amount of payments made on the marital debt. Therefore, we can find no abuse of discretion by the district court in failing to credit Shawn for these payments.

### (iii) Marital Property Sold to Pay Marital Debt

Shawn contends that he sold a 2004 Dodge Viper ($6,000), a 1981 Ford F-700 ($1,500), and a baler ($1,500), which were all purchased during the marriage, to make payments towards the marital debt. The district court's decree charges Shawn with the value of these items. Again, the only evidence that Shawn sold these items and applied the profits to the marital debt is his own testimony. Given the district court's finding regarding the credibility of Shawn's testimony, we cannot say the district court abused its discretion by including these items in the marital estate and allocating them to Shawn rather than crediting Shawn for their sale.

### (iv) Kinetic's Account Balances

Shawn argues that the district court improperly included the 2016 balances of Kinetic's bank account and accounts receivable, despite no balances existing at the time of trial. Shawn contends that the district court should have valued the assets on a particular "given date." Brief for appellant at 31.

As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. The date of valuation is reviewed for an abuse of the trial court's discretion. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019). As we have found above, Kinetic is the alter ego of Shawn and therefore its assets are properly included in the marital estate.

Shawn testified in a 2018 deposition that as of July 31, 2016, Kinetic had $7,000 or $8,000 in a bank account and $13,293 in its accounts receivables. Shawn testified at trial that Kinetic no longer held any cash in its respective accounts, but he provided no corroborating documentation. The district court valued Kinetic's accounts at amounts provided by Shawn in his 2018 deposition and found Shawn's testimony in his deposition to be more credible than his testimony at trial. We cannot say that district court abused its discretion in using 2016 as the year of valuation.

We find that the district court did not abuse its discretion in including the property discussed above in the marital estate. This assignment of error fails.

## 2. ALIMONY

Shawn next assigns that the district court erred in ordering him to pay $500 in alimony to Brenda for the next 60 months. Shawn argues that Brenda "received much more from the marriage than she provided." Brief for appellant at 24. Shawn argues that he was earning less than Brenda at the time of trial.

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic

circumstances and the other criteria enumerated in this section make it appropriate. The court may order payment of such alimony by one party to the other as may be

> reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. *Id*.

The Nebraska Supreme Court has articulated four factors that are relevant to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. See *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*. Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*.

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Id*. The ultimate criterion is one of reasonableness. *Id*. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*.

Here, our de novo review of the record reveals that during the majority of the parties' marriage, both Shawn and Brenda were employed and contributed to payment of household expenses. However, Brenda testified that she stayed at home with her children and Shawn's children (when they were having visitation with him) from 2003 to 2007, at Shawn's insistence. In his job with Wisconsin Airlines, Shawn earns a guaranteed salary of $41,000 per year. Shawn's W-2 forms reflect that he earned approximately $75,000 from Air Wisconsin Airlines in 2019, and $65,000 from Silverhawk Aviation in 2017. Shawn asserted that his monthly expenses were $6,186.65. While the parties were married Brenda became a licensed practical nurse and now earns an annual salary of $59,000. She asserted that her monthly expenses were $5,112.

The district court accepted Brenda's testimony that she interrupted her potential career advancement to care for children and found that Shawn has a greater earning capacity than Brenda. Under the circumstances of this case, we cannot say that the district court's award of alimony was patently unfair. Thus, we affirm the court's award of alimony in the sum of $500 per month for 60 months.

### 3. FEES

Shawn argues that the district court erred by ordering that he pay a discovery sanction and Brenda's attorney and expert witness fees.

(a) Sanctions

In its order entered on August 17, 2020, the district court imposed a $3,500 sanction on Shawn for failure to comply with the court's previous order that he make the planes and their logbooks available for appraisal. Shawn argues that since no appraisal of the planes was conducted, he should not be required to pay Parry's fee. Shawn also argues that he should be awarded costs for complying with the court's orders, including digitizing the logbooks.

Determination of an appropriate sanction for failure to comply with a proper discovery order initially rests with the discretion of the trial court, and its rulings with respect thereto will not be disturbed on appeal absent a showing of an abuse of that discretion. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

On June 26, 2020, the district court ordered Shawn to make the two planes available for appraisal for 48 hours, between June 30 and July 20. Brenda informed Shawn that Parry would be arriving in Lincoln on July 14 (a Tuesday) to perform the appraisal. Shawn had previously noted in an April 2019 motion that the planes were stored at the Lincoln Airport. However, Shawn had moved the Cessna 421B to Georgia in April 2020 and moved the Cessna 310R to Georgia on July 11 (a Saturday), and informed Brenda on that day that the planes would be in Georgia and available for Parry's appraisal there.

While Shawn argues that the district court's order did not designate a location for the appraisal, Shawn testified that the planes had been hangered in the Lincoln airport for years and asserted this fact in his April 2019 motion. Thus, it was reasonable for Brenda to make arrangements to have Parry come to Lincoln for the appraisal. Shawn was aware of the dates when Parry was traveling to Nebraska for the appraisal and informed Brenda that the planes had been moved to Georgia only 3 days (1 business day) before the scheduled appraisal.

Further, the record reflects that Shawn has refused to make the planes available for appraisal on multiple occasions. A large portion of the procedural history of this case is comprised of motions regarding the availability of the two planes for inspection. The district court had to twice order Shawn to produce the planes and Parry traveled to Nebraska on three occasions to inspect the planes, but was never able to complete an appraisal due to the planes' unavailability. The district court found that Shawn engaged in "obvious gamesmanship" regarding the plane appraisals. Therefore, we find the court's August 17, 2020, order that Shawn pay Brenda $3,500, the cost for Parry to appear in Nebraska in July 2020 for an appraisal which did not occur, to be an appropriate sanction and not an abuse of discretion.

We also find no abuse of discretion in the district court's denial of Shawn's request for costs associated with digitizing the planes' logbooks. While the district court did order Shawn to produce a digitized copy of the logbooks, we note this order came only after Brenda was permitted by the court to issue a Rule 6-334(A) subpoena on Shawn and Kinetic, which subpoena did not result in production of the logbooks. Additionally, Shawn's costs of $4,483.10 include $2,608.50 worth of labor. Shawn provided a $50 an hour estimate for his own labor in copying the logbooks, which we note is higher than the hourly rate he earns as an airline pilot. For these reasons, we do not find an abuse of discretion by not awarding Shawn costs.

(b) Brenda's Fees

Finally, Shawn assigns that the district court erred in finding that he made the proceedings more difficult and longer than necessary, and the court abused its discretion when it awarded Brenda $9,000 in attorney fees and $11,500 in expert witness fees.

*(i) Attorney Fees*

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id*. A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution and modification cases. *Id*. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id*.

An affidavit by Brenda's attorney states that as of August 28, 2020, (prior to the 4-day trial), Brenda had incurred attorney fees of $9,008.60 and that his hourly rate was $250 per hour. We cannot conclude that this fee award was unreasonable. The complaint for dissolution was filed over 4 years before trial. The record also demonstrates contentious discovery proceedings and as noted above, Shawn's failure to produce the plane and documentation, despite multiple court orders to do so, resulted in delay and a discovery sanction. We also note that the court accepted Brenda's evidence over that submitted by Shawn on most all of the contested issues. Thus, we find no abuse of discretion in the court ordering Shawn to contribute $9,000 to Brenda's attorney fees.

*(ii) Expert Witness Fees*

Neb. Rev. Stat. § 42-367 (Reissue 2016) permits a court to direct costs against either party in an action for dissolution of marriage. In a dissolution action, an appellate court reviews an award of expert witness fees de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014).

An invoice from Parry dated August 7, 2020, reflected a $15,000 cost to Brenda for Parry's fee for trial preparation and travel to Nebraska to conduct appraisals. Although Parry was not able to perform a formal appraisal of the planes, he made many attempts to travel to Nebraska to do so. Parry ultimately submitted and testified to a lengthy market analysis for both planes, which the district court cited in its valuation. Shawn also argues that Parry did not perform a complete review of the logbooks. However, Parry testified that he was unable to completely rely on the digital logbooks without examining the physical logbooks to determine that the digitized versions were accurate copies. Had Shawn produced the planes and physical logbooks for appraisal, it is likely that Parry would have been able to fully inspect the digitized logbooks and incorporate their information into his appraisal.

We find no abuse of discretion in ordering Shawn to pay Parry's appraisal fee. This assignment of error fails.

## VI. CONCLUSION

Having considered and rejected Shawn's assigned errors, we affirm the order of the district court in its entirety.

AFFIRMED.